UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

BERTHA A. JOHNSON,

                Plaintiff,

      v.

NEW YORK STATE DEPARTMENT OF
CORRECTIONS AND COMMUNITY SUPERVISION
and SUPERINTENDENT WILLIAM POWERS,

                Defendants.

**DECISION AND ORDER**
11-CV-79S

## I. INTRODUCTION

In this action, Plaintiff Bertha A. Johnson, an African American female, alleges that her employer, Defendant New York State Department of Corrections and Community Supervision ("DOCCS"), and Defendant Superintendent William Powers discriminated and retaliated against her in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. ("Title VII"), and the Equal Protection Clause of the Fourteenth Amendment.

Presently before this Court are Defendants' motion for summary judgment, Johnson's cross-motion for summary judgment, and related motions to strike. (Docket Nos. 117, 140, 146, 148.) For the following reasons, Defendants' motion is granted in part and denied in part, and Johnson's motion is denied as untimely.

## II. BACKGROUND

### A. Procedural History

This case has a long and convoluted history. Johnson initiated the action *pro se* against the "NYS Dept. of Correctional Svs-Albion Correctional Facility" on January 26,

1

2011.   (Docket No. 1.)   She then filed a series of supplemental exhibits and a proposed supplemental complaint that expanded the claims and parties.   (Docket Nos. 24, 26-28.) To allay the confusion caused by these piecemeal submissions, this Court directed Johnson to file an amended complaint incorporating her various allegations into a single, operative document.   (Docket No. 30.)   Johnson complied and filed her amended complaint on January 18, 2012, this time naming DOCCS and several individuals as defendants.   (Docket No. 32.)   She then again sought to supplement her pleading, resulting in the filing of a second amended complaint on February 27, 2012.   (Docket Nos. 31, 35, 36.)

The second amended complaint revived the initial confusion this Court sought to allay.   Johnson identified DOCCS, Albion Correctional Facility, and the New York State Department of Civil Services as the defendants in the caption, yet named 14 individuals as defendants in the body of the pleading, casting doubt on whom she actually intended to sue.   (Docket Nos. 36, 41.)

After screening the pleading pursuant to 28 U.S.C. § 1915 (e)(2)(B),[1] this Court determined that Johnson stated viable claims against DOCCS and three of the identified individuals as follows: (1) employment discrimination on the basis of race and gender in violation of Title VII against DOCCS; (2) interference with rights under the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. §§ 2601 et seq. against DOCCS; (3) retaliation in violation of Title VII, FMLA, and the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12111 et seq. against DOCCS; (4) state law negligence and breach-of-

---

[1] Johnson's second amended complaint was subject to screening because she was proceeding in forma pauperis.   (See Docket No. 3.)

2

contract against DOCCS; (5) state law assault against Defendant Lieutenant Wojcinski; and (6) state law unlawful imprisonment against Defendants Sergeant Brown and Captain Scalise.   (Docket No. 41.)   This Court dismissed the rest of the claims, terminated the remaining defendants, and ordered service of the summons and second amended complaint on Defendants Lieutenant Wojcinski, Sergeant Brown, and Captain Scalise. Id.

Motion practice concerning the second amended complaint then commenced. DOCCS first moved to dismiss each of Johnson's claims against it (except for her Title VII claims) on Eleventh Amendment immunity grounds, which this Court granted on September 12, 2012.   (Docket Nos. 42, 49.)   Johnson thereafter moved for additional time to serve the individual defendants, which this Court granted on October 19, 2012. (Docket Nos. 50, 51.)   The individual defendants then moved to dismiss the second amended complaint for lack of jurisdiction.   (Docket No. 53.)

It was at this time that Johnson's counsel appeared in the case.   (Docket No. 55.) Counsel opposed the individual defendants' motion to dismiss and cross-moved to amend the complaint.   (Docket Nos. 60, 61, 63.)   On May 1, 2013, this Court denied without prejudice Johnson's motion to amend, finding numerous deficiencies in the proposed third amended complaint, and reserved decision on the motion to dismiss pending the possible filing of a third amended complaint.   (Docket No. 66.)

On June 7, 2013, Johnson filed a second motion to amend her complaint, which Defendants opposed.   (Docket Nos. 67, 69.)   After full briefing, this Court granted Johnson leave to file a third amended complaint against DOCCS and Superintendent

3

William Powers, and granted the individual defendants' motion to dismiss the claims against them as barred by Correction Law § 24.   (Docket Nos. 71, 75.)

Johnson filed her third amended complaint on October 11, 2013.   (Docket No. 72.) It remains the operative pleading.   The third amended complaint names two defendants: DOCCS and Superintendent William Powers.   It alleges two Title VII claims against DOCCS and one Equal Protection claim against Powers.   As to DOCCS, Johnson alleges in her first cause of action that it discriminated against her on account of her race by subjecting her to disparate treatment and a hostile work environment, and, in her second cause of action, that it retaliated against her for engaging in protected activity. (Third Amended Complaint, Docket No. 72, ¶¶ 74-80.)   As to Powers, Johnson alleges in her third cause of action that he violated her Fourteenth Amendment right to equal protection of the laws.   Id. ¶¶ 81-84.

After each defendant answered the third amended complaint, the case proceeded to the assigned magistrate judge for supervision of all pretrial matters, including discovery.   (Docket Nos. 73, 77, 78.)   On May 27, 2014, the parties appeared before the magistrate judge and requested an extended discovery schedule, which the magistrate judge granted.   (Docket No. 82.)   The parties thereafter engaged in discovery under multiple case-management orders between June 2, 2014, and October 31, 2016. (Docket No. 114.)

On January 13, 2017, Defendants filed the pending motion for summary judgment together with all required and supporting documents.   (Docket No. 117.)   Johnson's response to the motion was due by February 13, 2017, but counsel twice sought

extensions due to workload and medical reasons, which defense counsel and this Court accommodated.   (Docket Nos. 119, 120, 121, 122.)   By approved stipulation, Johnson's response deadline was extended to July 31, 2017, with Defendants' reply due by August 31, 2017.   (Docket No. 122.)

On July 31, 2017, Johnson's counsel filed her own declaration (with 31 attached exhibits) and the affidavit of Lynn Hanesworth (with 2 attached exhibits).   (Docket Nos. 123, 124.)   Hanesworth was one of Johnson's co-workers.   This was the entirety of Johnson's timely response.

Eight days later, Johnson's counsel moved for an extension until August 14, 2017, to complete the filing of Johnson's response, explaining that a family emergency prevented her from completing the response by July 31, 2017.   (Docket No. 125.) Defendants' counsel consented to the extension, which this Court granted together with a concomitant extension of Defendants' time to file a reply to September 14, 2017. (Docket No. 126.)   But despite receiving this extension, counsel failed to complete Johnson's response and, in fact, made no filings by the August 14, 2017 deadline.

On August 25, 2017, 11 days after the deadline, Johnson's attorney filed the affidavit of Loretta Jackson (with 1 exhibit).   (Docket No. 128.)   Jackson is a former inmate of the Albion Correctional Facility.   Four days later, Johnson's counsel again moved to extend her time to complete the response for reasons stated in an *in camera* submission she claimed to have sent to chambers.   (Docket No. 129.)   Defendants opposed the motion, and this Court never received any *in camera* submission.[2]   (Docket

---

2 This Court subsequently directed counsel to file the *in camera* submission purportedly submitted on or around August 29, 2017, to complete the record, which she did on September 25, 2017.   (Docket Nos.

Nos. 130, 138.)   Nonetheless, with that opposed motion pending, Johnson's counsel continued her piecemeal response to Defendants' motion for summary judgment, filing her own supplemental declaration (with 3 exhibits) and an affidavit from Johnson (with 234 exhibits).   (Docket Nos. 132, 134-136, 161-168.)

On September 12, 2017, Defendants filed their reply memorandum and moved to strike the Jackson affidavit (Docket No. 128), Johnson's counsel's supplemental declaration (Docket No. 132), and Johnson's affidavit (Docket Nos. 134-136) on timeliness and substantive grounds.   (Docket Nos. 139, 140.)   Johnson opposed the motion in a sealed submission.   (Docket No. 170.)   That same month, Johnson moved to seal certain exhibits to Johnson's affidavit[3] and to file a memorandum of law in excess of 25 pages.[4]   (Docket Nos. 142, 143.)

On September 18, 2017, Johnson filed her Rule 56 Statement of Material Facts and a supplemental affidavit from Johnson (with 13 exhibits).   (Docket Nos. 146, 146-1, 146-2, 147.)   The next day, Johnson filed her memorandum of law.   (Docket No. 148.) The parties then engaged in mediation in November and December 2017, which proved unsuccessful.   (Docket No. 159.)

---

138, 149.)

3  The Clerk of Court rejected this motion due to filing deficiencies.   (See Unnumbered Docket Entry dated September 22, 2017.)   Counsel's second motion to seal the exhibits was also rejected for filing deficiencies.   (Docket Nos. 151, 155.)   This Court thereafter granted counsel's third motion to seal the exhibits in the interests of moving the case forward.   (Docket Nos. 157, 160, 171.)   The sealed exhibits are filed at docket numbers 161-168.

4  Johnson's counsel contends that she previously moved for a page extension by letter dated July 27, 2017.   (Docket No. 145, ¶ 6.)   From the letter appended to her submission (Docket No. 145-1), it appears that counsel faxed her letter to chambers.   This Court does not accept faxes.   Had counsel mailed her letter, this Court would have acted on it, but there is no record of any letter motion received from counsel.

On March 30, 2018, in the interests of advancing the case, and to accommodate Johnson's counsel's family emergencies and personal circumstances, this Court granted Johnson's motion to file her summary judgment response out of time and deemed each of her responsive submissions timely filed.   (Docket Nos. 129, 160.)   It further directed that the documents Johnson served on Defendants and submitted *in camera* be filed under seal, including the exhibits to Johnson's affidavit (Docket No. 134).   (Docket No. 160.)   Finally, this Court denied Defendants' motion to strike Johnson's submissions (Docket No. 140) on timeliness grounds, but noted that it would "revisit arguments made in Defendants' motion as necessary in the context of reviewing and adjudicating the pending motion for summary judgment."   (Docket No. 160.)   The Clerk of Court thereafter filed the sealed submissions on April 2, 2018, at which time the motion was taken under advisement.   (Docket Nos. 161-171.)

## B. Summary Judgment Record

Each party has moved to strike certain of the other's summary judgment filings. Defendants seek to strike the Jackson affidavit (Docket No. 128), Johnson's counsel's supplemental declaration (Docket No. 132), and Johnson's affidavit (Docket Nos. 134-136, 161-168.)   They do so on the grounds that the submissions predominantly contain inadmissible statements (hearsay, gossip, speculation, rumor, etc.), are from undisclosed witnesses, and are otherwise improper.[5]   (Docket No. 140.)   Johnson's opposition to Defendants' motion addresses only the timeliness arguments.   (Docket No. 170.)

---

5 Defendants also moved on timeliness grounds, but as noted, this Court denied that request.   (Docket No. 160.)

7

Johnson seeks to strike each of the affidavits that Defendants submitted (Docket Nos. 117-3, 117-5, 117-6, 117-7, 117-8, 117-9, 117-10, 117-11, 117-12), except for the affidavit of Ryan Belka (Docket No. 117-4), on the basis that they contain inadmissible statements.   (Docket No. 146, pp. 3-10.[6])   Because Johnson filed her request to strike out of time, Defendants did not respond.

A court resolving a motion for summary judgment considers only admissible evidence.   See Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997) ("[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment."); Fed. R. Civ. P. 56 (c)(1)(B) (requiring that facts be supported by admissible evidence); Fed. R. Civ. P. 56 (c)(2) (permitting objections to inadmissible facts asserted at summary judgment stage).   As such, evidence and statements that would be inadmissible at trial, such as inadmissible hearsay, cannot be used to support or oppose summary judgment.   See Patterson v. Cnty. of Oneida, N.Y., 375 F.3d 206, 219 (2d Cir. 2004) ("an affidavit's hearsay assertion that would not be admissible at trial if testified to by the affiant is insufficient to create a genuine issue for trial"); see also Raskin, 125 F.3d at 66 ("Because the purpose of summary judgment is to weed out cases in which there is no genuine issue as to any material fact . . . it is appropriate for districts courts to decide questions regarding the admissibility of evidence on summary judgment.") (internal quotations and citations omitted).

Rule 56 (c)(4) requires that affidavits or declarations submitted in support of or in opposition to motions for summary judgment "be made on personal knowledge, set out

---

6 All page number references herein are to the page numbers generated by the court's case management/ electronic case files system ("CM/ECF").

facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56 (c)(4). Courts may strike materials that do not comply with Rule 56 (c)(4), see Hollander v. Am. Cyanamid Co., 172 F.3d 192, 198 (2d Cir. 1999) abrogated on other grounds by Schnabel v. Abramson, 232 F.2d 83 (2d Cir. 2000), or they may disregard the improper portions, independently review the record, and consider only that which is admissible, see Russo v. Estee Lauder Corp., 856 F. Supp. 2d 437, 443 (E.D.N.Y. 2012) ("Where an affidavit or declaration contains material that does not comply with Rule 56 (c)(4), a Court may either disregard or strike it from the record.").

Having reviewed the parties' motions, this Court agrees that several of Johnson's submissions contain inadmissible and improper statements, including the Jackson affidavit (Docket No. 128) and Johnson's affidavit (Docket Nos. 134-136, 161-168). See, e.g., Bickerstaff v. Vassar Coll., 196 F.3d 435, 456 (2d Cir. 1999) (finding that the plaintiff's "[feelings and perceptions] of being discriminated against" are not evidence of discrimination). But rather than strike those two submissions in whole, this Court will independently assess the admissibility of the statements Johnson relies on and consider only admissible evidence. This Court will do the same with the affidavits Defendants submitted that Johnson seeks to strike. See Ramirez v. Michael Cetta Inc., 19-CV-986 (VEC), 2020 WL 5819551, at *4 (S.D.N.Y. Sept. 30, 2020) (limiting analysis to "those portions of the record that would be admissible at trial"); Grandy v. Manhattan & Bronx Surface Transit Operating Auth., No. 16-CV-6278, 2018 WL 4625768, at *4 (S.D.N.Y. Sept. 26, 2018) ("Where Plaintiff's declaration proffers facts that would not be admissible

9

in evidence, the Court has not considered them.").   The parties' respective requests to strike on non-disclosure grounds are denied given that no trial date has yet been set.

Johnson's counsel's supplemental declaration (Docket No. 132) is a different story: it is improper and of no evidentiary value.   Counsel recounts her conversations and dealings with a potential witness (including screen shots of text messages), improperly making *herself* a witness and relaying multiple levels of inadmissible hearsay.   Counsel does not hide that her hearsay-laden declaration is intended to substitute for the witness's testimony: "Ms. Newcombe very much wanted to share the truth on the record but this was a bad time."   (Supplemental Declaration, Docket No. 132, ¶ 17.)   Counsel's declaration is plainly improper and contains no admissible material.   It will therefore be stricken.

## C. Facts

The facts are hotly contested.   In short, the parties duel over whether Johnson was a recalcitrant employee who deserved each measure of discipline meted out, including her termination, or whether she was the target of false accusations and a years-long, coordinated effort to see her fired because she is an African American woman.

The record is voluminous, and as noted above, convoluted.   The parties have submitted documentary evidence and multiple depositions and declarations spanning thousands of pages.   A summary of the evidence, organized chronologically around significant incidents of discipline, follows.

### 1. Background Information (1989-2007)

Johnson began working for DOCCS as a corrections officer in January or February

10

1989.  (Defendants' Statement of Undisputed Facts ("Defendants' Statement"), Docket No. 117-2, ¶ 1; Plaintiff's Statement of Material Facts ("Plaintiff's Statement"), Docket No. 146, ¶ 1.[7])  She worked her entire career at the Albion Correctional Facility in Albion, New York, a medium-security women's facility.  (Affidavit of Bertha Johnson ("Johnson Aff."), Docket No. 134, ¶¶ 4, 58.)

### a.  First Notice of Discipline (October 20, 1993)

On October 20, 1993, DOCCS issued Johnson her first Notice of Discipline seeking her termination for failing to return her keyring at the end of her shift.[8]  (Plaintiff's Statement, ¶ 5; Declaration of Herman Reinhold ("Reinhold Decl."), Docket No. 117-7, ¶ 10 (Johnson-1578[9]).)  Johnson admits that she mistakenly took her keyring home. (Deposition of Bertha Johnson ("Johnson Dep."), Docket No. 123-1, pp. 312, 314, 315; Johnson Aff., ¶ 71.)  But she testified that other officers also mistakenly took keys home without consequence, yet she, one of the only African American, female officers, was disciplined when she mistakenly did so.  (Id. p. 315.)  Johnson further testified that Officer Staebell, a Caucasian male who worked "the key room," was not disciplined despite being responsible for ensuring that all keys (and other equipment) were returned. (Id. pp. 314-316, 318.)  Johnson settled the Notice by paying a fine.  (Plaintiff's

---

7 Because Johnson's Statement of Material Facts repeats verbatim the facts set forth in Defendants' Statement of Undisputed Facts in a fact-response format with parallel numbering, this Court will predominantly cite only Plaintiff's Statement for ease of reference.

8 This was not the first time Johnson was disciplined.  Sergeant Samuels previously issued Johnson a Formal Counseling on May 3, 1989, for losing her identification badge, and Sergeant Gabbidon issued her a Memorandum of Counseling on February 18, 1990, for failing to properly punch-in and for signing-in her own timecard without authorization.  (Plaintiff's Statement, ¶¶ 3, 4; Reinhold Decl., ¶¶ 8, 9 (Johnson-3774, 3775); Johnson Dep. p. 305.)

9 "Johnson-___" refers to the Bates-numbered documents appended to various affidavits.

Statement, ¶ 5; Reinhold Decl., ¶ 10 (Johnson-1574-75).)

Six years then passed without significant incident.

Beginning again in 1999, Johnson began receiving more reprimands and discipline, mostly from Sergeant Pyra.   Johnson claims that Sergeant Pyra targeted her for regular and excessive counseling over fabricated or trivial issues because she is an African American woman.   (Johnson Aff., Docket No. 134, ¶ 73.)   To that point, Johnson maintains that Sergeant Pyra permitted female Caucasian officers, including Officers Schumaker, Vandolyn, Brown, Fumansky, Flagler, and Robul, to violate the Employee's Manual without repercussions, while subjecting her to excessive discipline.   (Id. at ¶ 73 and Exhibit 27 (Johnson-1175).)   Johnson testified that Sergeant Pyra used false reports to harass and retaliate against her for filing discrimination complaints against him.[10] (Johnson Dep., pp. 327-28, 336, 345-49, 363.)   In her view, Sergeant Pyra was creating a "paper trail" to support her eventual termination.   (Id. p. 347.)

For example, Sergeant Pyra issued Johnson a Formal Counseling on July 22, 1999, for wearing earrings and having her shirt untucked in violation of the Employee's Manual, which Johnson concedes was technically warranted because she was wearing earrings but maintains that others who wore earrings were not disciplined.   (Plaintiff's Statement, ¶ 6; Reinhold Decl., ¶ 11 (Johnson-1613-1614); Johnson Aff., ¶ 73; Johnson Dep., pp. 329-30, 334.)   Less than two weeks later, on August 2, Sergeant Pyra issued Johnson another Formal Counseling for failing to follow his order to "fall in" at lineup and

---

[10] It appears that Johnson also filed a civil harassment suit against Sergeant Pyra during this time.   (Id. p. 332 (". . . I had to take [Pyra] to outside court for harassment."), 460-61; Johnson Aff., ¶ 70.)

for being disrespectful to him, Lieutenant Malanowski, and Johnson's fellow officers, conduct Johnson denies.   (Plaintiff's Statement, ¶ 7; Reinhold Decl., ¶ 12 (Johnson-1611-12); Johnson Dep. pp. 343, 345.)

More than two years then passed without significant incident.

### b.  Second Notice of Discipline (May 5, 2002)

On May 5, 2002, DOCCS issued Johnson a second Notice of Discipline seeking her termination for four incidents that allegedly occurred earlier that year.  (Id. ¶ 13; Reinhold Decl., ¶ 18 (Johnson-1312-13).)   First, DOCCS charged that on January 1, 2002, Johnson falsely accused Sergeant Pyra of destroying her time-off request for January 11, 2002, and then disobeyed his order to return to the office.  Id.  Second, DOCCS charged that on February 11, 2002, Johnson failed to make rounds with Sergeant Pyra.  Id.  Third, DOCCS charged that on March 2, 2002, Johnson wore multi-colored polish on her fingernails, in violation of DOCCS directives, despite being earlier told to remove the polish.  Id.  Finally, DOCCS charged that on March 4, 2002, Johnson failed to respond when her name was called at line-up and instead silently walked out of the room.  Id.

Johnson denies engaging in this conduct and maintains that Sergeant Pyra unlawfully targeted her for discipline.   (Plaintiff's Statement, ¶¶ 10-13; Reinhold Decl., ¶¶ 15-17 (Johnson-1329, 1726); Johnson Aff., ¶ 74.)   She settled the Notice on December 6, 2002, by paying a fine, but she maintains that DOCCS never investigated the facts asserted in the Notice or her complaints that Sergeant Pyra was unfairly targeting her. (Plaintiff's Statement, ¶ 13; Reinhold Decl., ¶ 18 (Johnson-1489); Johnson Aff., ¶¶ 75,

76.)   Defendants, on the other hand, contend that the Office of Diversity Management investigated Johnson's complaints and determined that they were unfounded, and that in fact, Johnson had accused Sergeant Pyra of wrongdoing to conceal her own non-compliance with directives and orders.   (Declaration of Michael Washington ("Washington Decl."), Docket No. 117-10, ¶¶ 6-9.)

Sergeant Pyra reported Johnson twice more in 2002.   On June 4, 2002, Sergeant Rizzo issued Johnson a Written Direct Order to trim her fingernails after she allegedly refused Sergeant Pyra's earlier verbal order to do so.   Johnson denies that Sergeant Pyra ever gave her a verbal order.   (Plaintiff's Statement, ¶ 14; Reinhold Decl., ¶ 19 (Johnson-1727, 1729).)   About two weeks later, on June 23, Sergeant Pyra issued Johnson a Memorandum Report for being insubordinate by repeatedly hanging up on him when he called her unit.   Johnson denies being insubordinate and maintains that Sergeant Pyra targeted her for discipline.   (Plaintiff's Statement, ¶ 15; Reinhold Decl., ¶ 20 (Johnson-1302).)

On August 28, 2002, Johnson filed a discrimination charge against Sergeant Pyra with the New York State Division of Human Rights.   (Johnson Aff., ¶¶ 77, 78, Exhibit 23 (Johnson-1504-06).)   Therein, she charged that Sergeant Pyra subjected her to differential treatment in comparison to similarly situated white officers in that he (1) did not call her name at roll call, (2) enforced rules against her that he did not enforce against white female officers, and (3) barred her from wearing fingernail polish but did not bar white female officers from wearing fingernail polish.   (Id.)   Johnson further maintained that she informed her superiors of Sergeant Pyra's conduct but they took no action to stop

14

the discrimination.   (Id.)

### c.  Third Notice of Discipline (July 29, 2003)

About one year after Johnson filed her discrimination charge, DOCCS issued Johnson a third Notice of Discipline on July 29, 2003, seeking her termination for sleeping, insubordination, and using racial insults.   (Plaintiff's Statement, ¶ 16; Reinhold Decl., ¶ 21 (Johnson-1427, 8285).)   The Notice charged Johnson with sleeping (or appearing to sleep) during training, refusing Captain Scalise's order to change into her uniform, and making obscene and racial comments to another officer, all on July 1, 2003.   (Reinhold Decl., ¶ 21 (Johnson-1427).)   Johnson admits that she was sleeping "for a few minutes," but disputes the nature of the other conduct.   (Johnson Dep., pp. 448, 449; Johnson Aff., ¶¶ 79-80.)   She maintains that Captain Scalise orchestrated the issuance of this Notice and fabricated evidence against her in a bid to discipline her more severely than she would a fellow Caucasian officer.   (Johnson Aff., ¶¶ 79-82.)

The Notice was submitted for arbitration before Miriam W. Winokur, Ph.D. (Johnson Aff., ¶ 81, Exhibit 26 (Johnson-8541).)   On July 30, 2004, nearly a year after issuance of the Notice, Arbitrator Winokur found Johnson guilty of sleeping during training and refusing the order to change into her uniform, but not guilty of making obscene and racial comments, a charge that Arbitrator Winokur found was brought without justification. (Plaintiff's Statement, ¶ 16, Johnson Aff., ¶ 81, Exhibit 26 (Johnson-8541-8551).) Arbitrator Winokur rejected termination of employment as too severe a penalty and instead imposed a 30-day suspension without pay and a 6-month probationary period. (Reinhold Dep., ¶ 21 (Johnson-1402).)

15

About 18 months then passed without significant incident.

Beginning in 2006, Johnson again began receiving reprimands and discipline. Sergeant Mahnke issued Johnson an Informal Counseling on January 29, 2006, for making inappropriate log-book entries, an allegation that Johnson denies and maintains was fabricated and orchestrated by Sergeant Pyra.   (Plaintiff's Statement, ¶ 18; Reinhold Decl., ¶ 24 (Johnson 867-68).)   On March 21, 2006, Sergeant Carr issued Johnson a Formal Counseling for making an inappropriate log-book entry, which Johnson similarly denies and pins on Sergeant Pyra.   (Plaintiff's Statement, ¶ 19; Reinhold Decl., ¶ 24 (Johnson-867-68).)   In December 2006, disputed issues began to arise with Johnson's timecards, including allegedly missing and defaced timecards, which issues persisted on-and-off for four years through February 2010.   (Plaintiff's Statement, ¶¶ 21, 23-28, 30, 31, 40, 45, 47; Reinhold Decl., ¶¶ 28, 30-33, 35, 36, 52 (Johnson-830, 832, 835, 836, 838, 840); Johnson Aff., ¶¶ 89-92.)

In March or April 2007, Johnson complained to DOCCS's affirmative action administrator that Lieutenant Malanowski, Lieutenant Long, and Sergeant Pyra targeted her for disparate discipline.   (Johnson Aff., ¶ 84.)   After investigating the complaint, Captain Wiley directed Johnson to call her counts into the Watch Commander (not Sergeant Pyra) to minimize direct contact.   (Plaintiff's Statement, ¶ 22; Reinhold Decl., ¶ 27 (Johnson-1619); Washington Decl., ¶¶ 15-17.)   On July 26, 2007, DOCCS advised Johnson that it had taken "appropriate administrative actions" to address her complaints. (Johnson Aff., ¶ 84, Exhibit 29 (Johnson-1370).)

### 2. Timely Incidents

#### a. Fourth Notice of Discipline (May 2, 2008)

Approximately one year later, on May 2, 2008, DOCCS issued Johnson her fourth Notice of Discipline, which sought imposition of a $1,000 fine, 10 days of lost annual leave, and a 6-month suspension of "swapping" privileges for excessive absenteeism. (Plaintiff's Statement, ¶ 29; Reinhold Decl., ¶ 34 (Johnson-1039-40).)   DOCCS later withdrew this Notice after the U.S. Department of Labor determined that it had violated Johnson's rights under the Family Medical Leave Act ("FMLA").   (Plaintiff's Statement, ¶ 29; Johnson Aff., ¶¶ 85-86, Exhibit 31.)   As Johnson explains it, DOCCS refused to afford her the same provisional FMLA coverage that it afforded other employees, including white employees, and only withdrew the Notice after she complained to the Department of Labor.   (Johnson Aff., ¶¶ 85-88, Exhibits 31 and 33 (Johnson-1182).)

#### b. Fifth Notice of Discipline (November 13, 2008)

On November 13, 2008, DOCCS issued Johnson a fifth Notice of Discipline. DOCCS sought Johnson's dismissal for failing to comply with a direct order from Deputy Superintendent of Administration Flanagan to submit missing timecards discovered as part of an audit.   (Plaintiff's Statement, ¶ 39; Reinhold Decl., ¶ 44 (Johnson-1142); Johnson Dep., p. 487.)   DOCCS previously counseled Johnson for failing to submit her timecards in September (see Plaintiff's Statement, ¶ 32; Reinhold Decl., ¶ 37 (Johnson-1120-1122)) and October 2008 (see Plaintiff's Statement, ¶¶ 33-36; Reinhold Decl., ¶¶ 38-41 (Johnson-1125, 1130)).   Johnson maintains that she properly reported her September absences to Sergeant Adamson (see Plaintiff's Statement, ¶ 32 and Johnson-

17

1120) and properly submitted timecards for her October absences (see Plaintiff's Statement, ¶¶ 33, 35-37 and Johnson-1125; Johnson Aff., ¶ 92 (Johnson-1130)).

The Notice arose from an October 20, 2008 report by Timekeeper Stevens, who reported to management that nine employees (consisting of both black and white, male and female officers), including Johnson, had not submitted three or more timecards between December 6, 2007, and September 24, 2008. (Plaintiff's Statement, ¶ 37; Reinhold Decl., ¶ 42 (Johnson-1845); Johnson Aff., ¶ 96.) Based on this report, Deputy Superintendent of Administration Flanagan ordered those officers involved to submit their missing timecards. (Plaintiff's Statement, ¶ 37; Johnson Aff., ¶ 93, Exhibit 35.) DOCCS maintains that this was part of a larger audit. (Id.; Reinhold Decl., ¶ 42 (Johnson-8407-8410).)

Johnson does not dispute that she received the October 21, 2008 direct order, but she maintains that she did not have any missing or delinquent timecards to submit. (Plaintiff's Statement, ¶ 37.) Rather, Johnson claims that Timekeeper Stevens misplaced or failed to submit her timecards, or that Sergeant Pyra discarded timecards that she had submitted. (Id.; Johnson Aff., ¶ 90.) She also claims that she sought guidance on submitting her timecards from Deputy Superintendent Flanagan, but he was unhelpful and denied receiving her inquiries. (Johnson Aff., ¶ 95, Exhibit 37.) Finally, Johnson asserts that DOCCS pretended that the issues with the timecards stemmed from a larger audit. (Plaintiff's Statement, ¶ 37; Johnson Aff., ¶ 96.) Nonetheless, Johnson submitted her timecards by December 16, 2008. (Johnson Aff., ¶ 104, Exhibit 45.)

In November 2009, Arbitrator Thomas N. Rinaldo, Esq., dismissed the charges in

18

the Notice due to "insufficient basis of evidence in the record to sustain the Charge." (Johnson Aff., ¶ 111, Exhibit 52.)   In doing so, Arbitrator Rinaldo found that DOCCS engaged in disparate treatment by treating Johnson less favorably than a similarly situated officer who was also issued a Notice of Discipline for the same failure to abide by Deputy Superintendent Flanagan's order.   Id.   Unlike in Johnson's case, however, that officer's Notice of Discipline was withdrawn upon submission of new timecards.   Id.

### c. Discrimination Charge and Sixth Notice of Discipline (May 11, 2009)

In December 2008, Johnson complained to Lieutenant Malanowski that Sergeant Pyra was mistreating her because of her race.   (Johnson Aff., ¶ 103, Exhibit 44 (Johnson-1659).)   Lieutenant Malanowski informed Captain Scalise of Johnson's complaints in a written memorandum dated December 28, 2008.   Id.   According to Johnson, no one ever contacted her about this complaint, and DOCCS took no remedial action.   (Johnson Aff., ¶ 103.)

On January 6, 2009, Johnson filed another discrimination charge against DOCCS with the New York Division of Human Rights.   (Johnson Aff., ¶ 108, Exhibit 47 (Johnson-5-7).)   Johnson complained that DOCCS was unlawfully discriminating against her because of her disability (anxiety/stress disorder), race, and in retaliation for her opposition to discrimination.   Id.   This related to Johnson's use of FMLA leave and the timecard issues discussed above.   Id.   Johnson amended her charge on March 4, 2009. (Johnson Aff., ¶ 108, Exhibit 48.)

While this charge was pending, DOCCS issued Johnson her sixth Notice of Discipline on May 11, 2009, seeking dismissal from service with loss of accrued leave for

Johnson spending more than half of her shift in the storeroom on April 1, 2009, and for making inappropriate log-book entries on April 11, 2009.   (Plaintiff's Statement, ¶¶ 43-46; Reinhold Decl., ¶¶ 48-51 (Johnson-44; 1625-26).)   Johnson denies these allegations and maintains that she was in the storeroom to avoid an ill inmate.   (Plaintiff's Statement, ¶ 44; Johnson Dep., p. 496; Johnson Aff., ¶¶ 131, 132.)

This Notice appears to have emanated from an incident occurring several months earlier.   On March 13, 2009, inmate Mary Robinson filed a grievance against Johnson complaining that Johnson embarrassed and belittled her by pounding on her cube and rattling keys to wake her several times because she was snoring.   (Plaintiff's Statement, ¶ 41; Reinhold Decl., ¶ 46 (Johnson-735).)   Johnson admits that she woke Robinson due to her snoring, but denies that she did so in an unprofessional manner.   (Plaintiff's Statement, ¶ 41; Johnson Aff., ¶¶ 115, 116.)   On March 25, 2009, the superintendent accepted Robinson's grievance and indicated that corrective action had been taken. (Johnson Aff., ¶ 122, Exhibit 60 (Johnson-6005).)

On April 6, 2009, Captain Scalise reviewed video surveillance from Johnson's 11:00 p.m. to 7:00 a.m. shift on March 31-April 1, 2009, to assess her conduct with inmates.   (Plaintiff's Statement, ¶¶ 42, 43; Johnson Aff., ¶¶ 117, 118; Declaration of Dale Scalise ("Scalise Decl."), Docket No. 117-8, ¶¶ 7-8.)   The parties dispute what is depicted in the video.[11]   Defendants maintain that it depicts Johnson harassing inmates; spending more than half of her 8-hour shift in the storeroom; and failing to conduct her midnight count.   (Plaintiff's Statement, ¶¶ 42, 43 (Johnson-9033-9042); Scalise Decl., ¶¶ 10-11.)

---

11 A copy of the video has been manually filed with the Clerk of Court.   (See April 2, 2018 unnumbered docket remark.)

Johnson maintains that she was simply interacting with inmates; was not excessively away from her post; and did not miss her midnight count.   (Id.; Johnson Aff., ¶¶ 117-129.) Captain Scalise reviewed the video footage and prepared a summary memorandum for Defendant Powers.   (Johnson Aff., ¶ 119 (Johnson-9033-9042).)

In July 2009, while her charges with the New York Division of Human Rights were still pending, Johnson filed a complaint with DOCCS's Employee Assistance Program concerning Captain Scalise, Sergeant Pyra, Lieutenant Wojcinski, and Sergeant Elsenheimer.   (Johnson Aff., ¶ 137, Exhibit 70.)   She continued her complaints that these individuals were retaliating against her, targeting her for discipline, and treating her more harshly than other officers.   Id.   Johnson filed a second complaint with the same office on August 24, 2009, continuing to complain about disparate treatment and retaliation.   (Johnson Aff., ¶ 145, Exhibit 73.)   A 7-month investigation into Johnson's 2009 complaints by the Office of Diversity Management determined that they were each unfounded.   (Washington Decl., ¶¶ 24-30.)

On September 9, 2009, Johnson amended her discrimination charge pending with the New York Division of Human Rights.   (Johnson Aff., ¶ 138, Exhibit 71 (Johnson-919-922).)   She complained that the sixth Notice of Discipline was a continuation of the retaliation and discrimination she was experiencing on account of her gender, race, and disability.   Id.   The New York Division of Human Rights investigator subsequently determined that probable cause existed to believe that DOCCS had unlawfully discriminated against Johnson.   (Johnson Aff., ¶¶ 139-144, Exhibit 72 (Johnson-1159-1169).)

On January 28, 2010, Judge Spencer D. Phillips, the administrative law judge presiding over the discrimination charge, scheduled a public hearing for March 5, 2010. (Johnson Aff., ¶ 155, Exhibit 77.)   Four days before the hearing, Sergeant Mahnke issued Johnson a Formal Counseling for writing personal comments on her timecard dated January 28–February 10, 2010.   (Plaintiff's Statement, ¶ 48; Reinhold Decl., ¶ 53 (Johnson-828-29); Johnson Aff., ¶¶ 156, 158.)   Johnson maintains that other officers' timecards had personal comments written on them as well, but those officers, including Marcia Acosta and William Arnet, did not receive counseling or discipline.   (Johnson Aff., ¶ 158, Exhibit 79.)

On August 19, 2010, Judge Phillips dismissed Johnson's discrimination charge on the basis that she did not suffer an adverse employment action because DOCCS withdrew the fourth Notice of Discipline related to her FMLA leave and because the arbitrator found in Johnson's favor concerning the fifth Notice of Discipline relating to the submission of timecards.   (Johnson Aff., ¶ 187, Exhibit 102 (Johnson-7246-57).)

According to Johnson, DOCCS never pursued the sixth Notice of Discipline. (Johnson Aff., ¶ 152.)

### d. Seventh Notice of Discipline (August 27, 2010) and Johnson's Suspension

On March 9, 2010, Captain Scalise directed Johnson to remove library passes that were obstructing the view from the window behind the officers' desk.   (Plaintiff's Statement, ¶ 49; Reinhold Decl., ¶ 54 (Johnson-1188).)   Johnson denies receiving this verbal directive from Captain Scalise.   (Plaintiff's Statement, ¶ 49.)   Through the end of March 2010, Johnson was counseled several times for failing to remove the library passes

22

from the window.   (Plaintiffs' Statement, ¶¶ 50, 51, 52, 53; Reinhold Decl., ¶¶ 55-58 (Johnson-23-42, 850, 851).)

Johnson maintains that she complied with all orders given to her and that she was the only officer required to remove the passes.   (Plaintiff's Statement, ¶¶ 50, 51, 53; Johnson Aff., ¶¶ 156, 161-176.)   She complained about being singled out for disparate treatment concerning the passes since other officers left the passes in the windows without repercussion.   (Johnson Aff., ¶¶ 156, 161-176; Exhibits 82-87, 89 (Johnson-8460, 1188).)   For example, Johnson testified that white officers were not similarly disciplined for the same infractions.   (Johnson Dep., pp. 378, 391.)   She further testified that Defendants retaliated against her for filing internal complaints and charges with the New York Division of Human Rights.   (Id. p. 392.)

The parties dispute Johnson's conduct over the next few months, between April and July 2010.   DOCCS claims that Johnson submitted documents with improper writing on them (Plaintiff's Statement, ¶¶ 54 (timecards); 56 (contraband receipts)), made inappropriate log-book entries (id. ¶ 55), and had attendance issues (id. ¶¶ 58, 60, 61).

On August 24, 2010, DOCCS suspended Johnson indefinitely without pay for being insubordinate to Lieutenant Wojcinski as it related to removing library passes and other items from the officers' desk window.   (Id. ¶ 63; Reinhold Decl., ¶ 68; Johnson Aff., ¶¶ 186, 197.)   Three days later, DOCCS issued Johnson a seventh Notice of Discipline seeking dismissal from service and loss of accrued leave for various instances of insubordination and failure to follow orders.   (Plaintiff's Statement, ¶¶ 62-66; Reinhold Decl., ¶ 71 (Johnson-891-92).)

23

The Notice charged Johnson with being insubordinate to Lieutenant Wojcinski and Deputy Superintendent of Security Amoia in March and August 2010 as it pertained to removing items from the window behind the officers' desk, making inappropriate log-book entries in April 2010, making inappropriate comments on a contraband receipt in April 2010, possessing co-workers' timecards without authorization in April 2010, failing to report her arrest in July 2010,[12] and failing to turn in her badge and report it missing upon being suspended for insubordination in August 2010.   (Reinhold Decl., ¶ 71 (Johnson-891-92).)   Johnson denies engaging in this conduct, and she continued to complain about being targeted for discipline.   (Plaintiff's Statement, ¶¶ 54-56, 58, 60, 61; Johnson Aff., ¶¶ 177-181, Exhibits 91, 93, 94.)

The matter was submitted to arbitration.   On June 6, 2011, Arbitrator Dr. James R. McDonnell suspended Johnson for 45 days and ordered her to attend anger-management counseling.   (Plaintiff's Statement, ¶¶ 66, 67; Reinhold Decl., ¶ 71 (Johnson-23-42).)   Arbitrator McDonnell found that Johnson demonstrated "a continuing pattern of unwillingness to follow orders and procedures—instead having the tendency to resort to self-help rather than following proper procedure."   (Reinhold Decl., ¶ 71 (Johnson-40).)   He found Johnson guilty of (1) permitting items to block the officers' station window, (2) tearing up a direct order given to her, (3) making inappropriate log-book entries, (4) possessing department documents without authorization, (5) failing to report her arrest, and (6) failing to report her lost badge.   Id.

In assessing the case, Arbitrator McDonnell found that DOCCS appeared to

---

12 Johnson was arrested on July 25, 2010, in what she maintains was a case of mistaken identity. (Plaintiff's Statement, ¶ 59.)

"engage in discriminatory treatment" of Johnson by not "disciplining or even questioning who was actually placing the items in the windows."   (Reinhold Decl., ¶ 71 (Johnson-37).)   He further expressed his concern with "[DOCCS's] failure to provide for equal treatment [of Johnson] and avoid piling on [charges]."   Id. (Johnson-41).   In the end, Arbitrator McDonnell reduced the penalty sought by DOCCS—termination of Johnson's employment—in favor of a 45-day suspension and an anger-management-counseling mandate.   Id.   In Arbitrator McDonnell's view, such a reduced penalty was appropriate because DOCCS failed to prove all of the charges and "ha[d] engaged in some level of discriminatory treatment and piling on with respect to the pursuit of these charges against [Johnson]."   Id.

Despite Arbitrator McDonnell's decision, Johnson maintains that she did not engage in the charged conduct and insists that Lieutenant Wojcinski targeted her for this discipline because she is African American and filed discrimination complaints against DOCCS and its employees.   (Johnson Dep., pp. 371, 377; Johnson Aff., ¶¶ 177-180, Exhibits 91, 93, 94.)

### e.  Johnson's Discrimination Complaints While Suspended

On September 1, 2010, while suspended, Johnson filed another discrimination charge against DOCCS with the New York Division of Human Rights complaining that the incidents identified in the seventh Notice of Discipline constituted additional disparate treatment and excessive discipline against her by DOCCS in retaliation for her previously filing discrimination complaints.   (Johnson Aff., ¶ 191, Exhibit 107.)   The New York Division of Human Rights subsequently found probable cause to believe that DOCCS had

25

engaged in unlawful discrimination and referred the matter to an administrative law judge, but the matter was dismissed on December 12, 2011, when Johnson decided to pursue the instant civil case against DOCCS instead.   (Johnson Aff., ¶¶ 191, 206, Exhibits 109, 120.)

On September 10, 2010, Johnson again complained to the Office of Diversity Management about the treatment she was experiencing.   (Johnson Aff., ¶ 192, Exhibit 110.)   She maintained that she was suffering severe harassment, retaliatory attacks, and unwarranted suspension, and an effort to get her fired through the issuance of unwarranted Notices of Discipline.   Id.   She detailed her previous complaints and reiterated that no remedial action was being taken.   Id.

Johnson filed the instant employment-discrimination action pro se on January 26, 2011.   (Docket No. 1; Johnson Aff., ¶ 201.)   Defendant Powers emailed a copy of the complaint to Deputy Superintendent Amoia and others on March 9, 2011.   (Johnson Aff., ¶ 208, Exhibit 122 (Johnson-7421).)   Plaintiff filed a second employment-discrimination action in federal court on April 18, 2011. [13]   (Johnson Aff., ¶ 216, Exhibit 128.)   Defendant Powers distributed notice of the second lawsuit as well.   (Johnson Aff., ¶ 219, Exhibit 131 (Johnson-7502).)

On May 23, 2011, Johnson filed discrimination charges against DOCCS with the U.S. Equal Employment Opportunity Commission claiming unlawful retaliation.   (Johnson Aff., ¶ 218, Exhibit 130.)   Johnson alleged that DOCCS retaliated against her

---

[13] On November 8, 2011, Johnson and DOCCS stipulated to dismissal of this second action as duplicative of the instant case.   See Johnson v. N.Y. State Dep't of Corr. Servs., 11-CV-327S, Docket No. 18 (W.D.N.Y. Nov. 8, 2011).

for her previous charges of discrimination by making false claims about her in the arbitration proceeding concerning the seventh Notice of Discipline.   Id.

### f.  Incident between Johnson and Lieutenant Wojcinski

Johnson returned to work from suspension on or about June 10, 2011.   (Johnson Aff., ¶ 225, Exhibit 136 (Johnson-706).)   She claims that Lieutenant Wojcinski threatened her 10 days later, on June 20.   (Johnson Aff., ¶ 226.)   Johnson describes the incident as follows:

> The threat from Lt. Wojcinski occurred at morning lineup when I was standing outside of the lineup room due to overcrowding.   I was in the vicinity of C.O. Leslie Jones, C.O. Brown and C.O. Newburgh.   When Lt. Wojcinski walked past us, I was standing against the wall.   When he saw me against the wall, he stopped, jumped forward at me, positioned his body in a posture as to hit me or confront me (mounting and thrusting his upper body and chest towards me in a fighting posture, a posture known to instigate physical fighting) and shouted "WHAT" as to taunt me, intimidate me and threaten me.   I could only jerk my face away from him but could not move my body back or otherwise distance myself or get away because I was already against the wall in a narrow hallway . . . He was in my face, close enough that if I put my arm out at all, I could have been touching him because he left no room between us.

(Johnson Aff., ¶ 227.)   Lieutenant Wojcinski denies that he threatened Johnson and contends he was responding to someone who called his name.   (Declaration of Kevin Wojcinski, Docket No. 117-11, ¶¶ 11-14; Johnson Aff., ¶ 243, Exhibit 143.)

Johnson reported this incident to Sergeant Goodman, who granted her permission to use a telephone to file a complaint with the local police.   (Johnson Aff., ¶ 228.) Johnson claims that she encountered Captain Scalise on her way to use the telephone, reported the incident to her, and expressed fear for her safety, but Captain Scalise offered

no assistance.   (Johnson Aff., ¶ 229.)   Captain Scalise denies the accuracy of this account.   (Johnson Aff., ¶ 244, Exhibit 144.)

Johnson eventually made her way to a telephone and called the police.   (Johnson Aff., ¶¶ 228-232, Exhibit 138 (Johnson-6102).)   She reported that Lieutenant Wojcinski had physically threatened her, that she feared for her safety, and that she wanted police to respond to the correctional facility.   (Johnson Aff., ¶ 230.)   When the police arrived at the front gate, Johnson met them there and gave a statement.   (Johnson Aff., ¶ 233.)

After reporting this incident to the police, Johnson feared encountering Lieutenant Wojcinski during her shift and perceived his threat to be retaliation for her past complaints about him.   (Johnson Aff., ¶ 233.)   During her shift, Johnson submitted written complaints to Sergeant Goodman (Johnson Aff., ¶ 234, Exhibit 139) and to Lieutenant Wojcinski, Captain Scalise, Deputy Director of Security Amoia, and Defendant Powers (id. ¶ 235, Exhibit 140).[14]

At approximately 11:00 a.m., Sergeant Brown called Johnson away from her post and directed her to go to the Charts office.   (Johnson Aff., ¶ 237.)   Once in the office, Sergeant Brown advised Johnson that he had been instructed by supervisors to place her in a conference room.   (Id.)   He instructed her not to leave the room until he or Captain Scalise returned to get her.   (Id.)   Johnson believed that she was locked in the room, and after some time, began to panic, eventually passing out and soiling herself.   (Id. ¶¶ 237-239.)   She awoke in pain and summoned help by kicking the door.   (Id. ¶ 239.)

---

14  A week or so after the incident, Johnson filed a formal complaint with the facility.   (Johnson Aff., ¶ 236, Exhibit 141 (Johnson-6139).)

Officers responded and called an ambulance, which transported Johnson to the hospital for treatment.   (Id.)   Johnson reported that she was left alone in the conference room from 11:00 a.m. to 2:35 p.m.   (Johnson Aff., ¶ 262, Exhibit 157 (Johnson-8711).)

Defendant Powers disputes Johnson's version of this event.   He maintains that it is common practice to order employees involved in a workplace incident to wait in the conference room while facility administration coordinated a response with relevant entities.   (Declaration of William Powers ("Powers Decl."), Docket No. 117-6, ¶¶ 19-21.) He further contends that Johnson's claim that she was locked in the room is demonstrably false, because the doors do not lock in such a way that they cannot be opened from the inside.   (Id. ¶¶ 25-27.)

Johnson contends that she was placed in the conference room in retaliation for complaining about Lieutenant Wojcinski's threat and for winning reinstatement through arbitration.   (Id. ¶ 240.)   She complained about this incident to Defendant Powers, but he allegedly took no action.[15]   (Id. ¶ 255, Exhibit 151.)   And according to Johnson, no one ever contacted her in response to her complaints against Lieutenant Wojcinski, though the record reflects that the facility investigated and referred Johnson's complaint to Labor Relations for additional review and investigation.   (Id. ¶¶ 242, 245, 258, 264, Exhibit 153 (Johnson-7959).)

Due to the injuries sustained in the conference room, Johnson was out on Workers' Compensation from June 21 to August 17, 2011.   (Johnson Aff., ¶ 256.)   While off from

---

15 Defendant Powers maintains that he appropriately investigated each of Johnson's complaints. (Declaration of William Powers, Docket No. 117-6, ¶¶ 12-16.)

work, Johnson filed a complaint with the Office of Diversity Management concerning Lieutenant Wojcinski's threat against her.   (Johnson Aff., ¶ 262, Exhibit 157 (Johnson-8711).)   That office directed Defendant Powers to investigate Johnson's claims. (Johnson Aff., ¶ 263, Exhibit 158 (Johnson-7636).)   Johnson further complained directly to Defendant Powers in November 2011, but Powers responded that he could not comment on a disciplinary proceeding.   (Johnson Aff., ¶ 267, Exhibit 160 (Johnson 6188, 6189-90).)   After receiving the results of the investigation, which included 16 witness statements, the Office of Diversity Management determined that no actionable conduct had occurred.   (Washington Decl., ¶¶ 40-43.)

### g.  Johnson's Encounter with Corrections Officer Meli-Rider and Eighth Notice of Discipline (March 28, 2012)

In late 2011, Johnson began working in a new unit.   (Johnson Aff., ¶ 270.)   She soon encountered fellow officer Meli-Rider.   One morning in November 2011, during lineup, Meli-Rider accused Johnson of standing in her spot.   (Johnson Aff., ¶ 271.) Johnson reported this incident as aggressive and inappropriate.   (Johnson Aff., ¶¶ 271, 292, Exhibits 162, 177.)   Johnson later discovered that Meli-Rider was close with Lieutenant Wojcinski and Captain Scalise and would "hang out" in their offices.[16] (Johnson Aff., ¶ 272.)

In early February 2012, Meli-Rider refused to send Johnson's inmate porter (Inmate Newcombe) to her work assignment in Johnson's unit on multiple occasions (or

---

16 Around this time, Johnson amended her complaint in this case to add Captain Scalise, Lieutenant Wojcinski, Sergeant Elsenheimer, Deputy Director of Security Amoia, and Defendant Powers as defendants.   (Johnson Aff., ¶ 273.)

sent her late), which prevented Johnson from completing her job duties.   (Johnson Aff., ¶¶ 274-277, 279, 281, 287.)   At least twice, Meli-Rider hung up on Johnson when she called to inquire about the inmate porter's whereabouts, one time calling Johnson a "black bitch."   (Johnson Aff., ¶¶ 279, 281, 282, 283, Exhibit 169.)   Yet Meli-Rider sent inmate porters to Caucasian colleagues without incident, including to corrections officers Bethune and Williams.   (Id. ¶ 274, Exhibit 169.)   Johnson reported Meli-Rider to numerous people, including to Sergeant Lewis, who at one point directed Meli-Rider to send Johnson her inmate porter promptly.   (Johnson Aff., ¶¶ 277, 280, 283, 284, Exhibits 167, 169, 170.)

Meli-Rider also reported Johnson.   On February 7, 2012, Meli-Rider submitted a written memorandum to Sergeant Elsenheimer reporting that Johnson threatened her during one of the phone calls above when Johnson told Meli-Rider that she better be careful because she "did not know who she was fucking with."   (Plaintiff's Statement, ¶ 72; Johnson Aff., ¶ 286, Exhibit 171.)   Sergeant Elsenheimer's investigation revealed that the inmate porter confirmed that Johnson made the above statement to Meli-Rider and that the inmate was not scheduled to work for Johnson at the time she demanded that Meli-Rider send the inmate.   (Declaration of Patrick Elsenheimer, Docket No. 117-5, ¶¶ 7-12; Washington Decl., ¶¶ 44-51.)   Nonetheless, Johnson denies threatening Meli-Rider.   (Johnson Aff., ¶ 286.)

On March 28, 2012, DOCCS issued Johnson an eighth Notice of Discipline alleging that Johnson lost her badge and identification and made unprofessional comments to her fellow officers.   (Plaintiff's Statement, ¶ 74; Reinhold Decl., ¶ 79;

(Johnson-6296-97).)   This Notice charged Johnson with insubordination for failing to obey an order not to release her inmate porters before the end of their shifts, inappropriate conduct as it relates to the inmate-porter situation with Meli-Rider, and losing her identification badge.   Id.   Johnson complained about the Notice to her supervisors (including Defendant Powers), but DOCCS elected not to pursue this Notice after it filed a subsequent Notice of Discipline against her, as discussed below.   (Reinhold Decl., ¶ 79; Johnson Dep., p. 585; Johnson Aff., ¶¶ 299, 300.)

### h.  Ninth Notice of Discipline (April 9, 2012) and Johnson's Termination

On April 6, 2012, Johnson allegedly assaulted and threatened Meli-Rider during line-up, which Johnson denies.   (Plaintiff's Statement, ¶ 75; Johnson Aff., ¶¶ 301-310.) DOCCS immediately suspended Johnson without pay and did not speak to her or otherwise get her version of what occurred.   (Johnson Aff., ¶¶ 307, 308, Exhibits 188, 189.)   Later that day, Johnson filed a written complaint with Captain Scalise, Sergeant Nerber, and Defendant Powers complaining that she was being discriminated and retaliated against.   (Johnson Aff., ¶ 309, Exhibit 190 (Johnson 6407- 6408).)

As a result of this interaction, DOCCS issued a ninth Notice of Discipline against Johnson seeking dismissal from service and loss of accrued leave.   (Id. ¶ 76; Reinhold Decl., ¶¶ 81, 82 (Johnson-6341); Johnson Aff., ¶ 311.)   The Notice charged Johnson with engaging in workplace violence and threats of violence on April 6, 2012, by "extend[ing] [her] elbows in an effort to prevent [Meli-Rider] from having a place as briefing/roll call, pushed/shoved her, and threatened Officer Meli[-Rider]; stating, "I'll meet you in the parking lot."   Id.   Johnson disputes that she ever engaged in this conduct,

and she grieved the Notice, which resulted in binding arbitration.[17]   (Plaintiff's Statement, ¶ 77; Johnson Aff., ¶¶ 301-310.)

Lise Gelernter, Esq., served as arbitrator.   (Plaintiff's Statement, ¶ 77.)   She conducted a two-day hearing in June 2012, at which both DOCCS and Johnson were represented by counsel.   (Id. ¶¶ 80, 81.)   After hearing and considering the testimony and evidence, Arbitrator Gelernter issued a 26-page decision largely in DOCCS's favor on September 28, 2012.   (Opinion and Award, Docket No. 117-7, pp. 158-183.)

As to the substantive charges, Arbitrator Gelernter found that "the evidence showed that Ms. Johnson is guilty of the charges in the [Notice of Discipline] that she shoved and elbowed Ms. Meli purposefully and then made remarks that a reasonable person would construe as threatening under the circumstances . . . This violated the agency's Workplace Violence Prevention Program and Sections 2.2 and 2.6 of the Employee's Manual."   (Opinion and Award, pp. 17, 26.)   As to the appropriate penalty, Arbitrator Gelernter found that termination of employment was a proper penalty considering Johnson's poor disciplinary record and the failure of progressive disciplinary sanctions to curb her misconduct.   (Id. pp. 18, 19, 24, 26.)   Arbitrator Gelernter therefore denied Johnson's grievance and upheld her termination.   (Id. p. 26.)

As a result of Arbitrator Gelernter's decision, DOCCS terminated Johnson's employment.   (Plaintiff's Statement, ¶ 110.)

### III. DISCUSSION

Johnson asserts three claims—two against DOCCS and one against Defendant

---

17 Johnson also filed charges with the New York Division of Human Rights complaining of race and gender discrimination and retaliation.   (Johnson Aff., ¶ 326, Exhibit 203.)

Powers.   In her first cause of action, Johnson claims that DOCCS discriminated against her based on her race by subjecting her to disparate treatment and a hostile work environment.   In her second cause of action, Johnson claims that DOCCS retaliated against her for engaging in protected activity.   In her third cause of action, Johnson claims that Powers violated her Fourteenth Amendment right to equal protection of the laws.   Defendants seek summary judgment on each claim.

### A. Summary Judgment Standard

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (a).   A fact is "material" if it "might affect the outcome of the suit under the governing law."   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).   An issue of material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."   Id.

In deciding a motion for summary judgment, the evidence and the inferences drawn from the evidence must be "viewed in the light most favorable to the party opposing the motion."   Addickes v. S.H. Kress & Co., 398 U.S. 144, 158-59, 90 S. Ct.1598, 1609, 26 L. Ed. 2d 142 (1970).   "Only when reasonable minds could not differ as to the import of evidence is summary judgment proper."   Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991).   Indeed, "[i]f, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper."   Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 82–83 (2d Cir. 2004) (citations omitted).

34

But a "mere scintilla of evidence" in favor of the nonmoving party will not defeat summary judgment.   Anderson, 477 U.S. at 252.   A nonmoving party must do more than cast a "metaphysical doubt" as to the material facts, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986); it must "offer some hard evidence showing that its version of the events is not wholly fanciful," D'Amico v. City of New York, 132 F.3d 145, 49 (2d Cir. 1998).   That is, there must be evidence from which a factfinder could reasonably find for the nonmoving party. Anderson, 477 U.S. at 252.

In the end, the function of the court at the summary judgment stage is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."   Id. at 249; see also Jeffreys v. City of New York, 426 F.3d 549, 551 (2d Cir. 2005) ("district courts may not weigh evidence or assess the credibility of witnesses at the summary judgment stage").   "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment."   Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996).

In employment-discrimination cases, the United States Court of Appeals for the Second Circuit has instructed district courts to use extra care when deciding whether to grant summary judgment, because "the ultimate issue to be resolved in such cases is the employer's intent, an issue not particularly suited to summary adjudication."   Eastmer v. Williamsville Cent. Sch. Dist., 977 F. Supp. 207, 212 (W.D.N.Y. 1997) (quoting Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1224 (2d Cir. 1994)).   But that does not preclude summary judgment in employment-discrimination actions: "[t]he summary

judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion."   Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985).   Indeed, the Second Circuit has noted that "the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials— apply no less to discrimination cases than to commercial or other areas of litigation."   Id.

### B. Statutes of Limitations

"Title VII requires that individuals aggrieved by acts of discrimination file a charge with the EEOC within 180 or, in states like New York that have local administrative mechanisms for pursuing discrimination claims, 300 days 'after the alleged unlawful employment practice occurred.'"   Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 78-79 (2d Cir. 2015) (quoting 42 U.S.C. § 2000e-5 (e)(1)); Duplan v. City of New York, 888 F.3d 612, 621-22 (2d Cir. 2018).   An "employment practice" in this context refers to "a discrete act or single 'occurrence'," and, for statute of limitations purposes, an "employment practice" occurs on the day it happens.   Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 110-11, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002).   Therefore, "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges."   Id. at 113.   Accordingly, "[a] party . . . must file a charge within either 180 or 300 days of the date of the act or lose the ability to recover for it."   Id.   The party must then file suit in federal court within 90 days of receiving a right-to-sue letter from the agency.   See Duplan, 888 F.3d at 621-22; 42 U.S.C. § 2000e-5 (f)(1).

The statute of limitations for a § 1983 claim is "that which the State provides for personal-injury torts," which in New York is three years.   Wallace v. Kato, 549 U.S. 384, 387, 127 S. Ct. 1091, 166 L. Ed. 2d 973 (2007); see Berman v. Perez, No. 17-CV-2757 (JGK), 2018 WL 565269, at *2 (S.D.N.Y. Jan. 24, 2018) (citing Hogan v. Fischer, 738 F.3d 509, 517 (2d Cir. 2013), in turn citing N.Y. C.P.L.R. § 214); see also Vega, 801 F.3d at 79 ("a plaintiff asserting a claim of discrimination under § 1983 must file suit within three years of the adverse employment action").

Here, Johnson first filed her charge of discrimination with the New York Division of Human Rights on January 6, 2009, and thereafter timely filed this action on January 26, 2011.[18]   (Third Amended Complaint, ¶¶ 15-19.)   Consequently, Johnson's timely Title VII claims are those arising on or after March 12, 2008 (300 days before January 6, 2009) and her timely § 1983 claims are those arising on or after January 26, 2008 (three years before January 26, 2011).   Any claims falling outside those timeframes are barred on statute of limitations grounds.

## C. Defendants' Motion for Summary Judgment

### 1. Title VII Claims

Under Title VII, it is unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin."   42 U.S.C. § 2000e-2(a)(1); Desert Palace, Inc. v. Costa, 539 U.S. 90, 92-93, 123 S. Ct. 2148, 2150, 156 L. Ed. 2d 84 (2003).   This provision prohibits intentional discrimination (disparate

---

18 Johnson filed this action within 90 days of receiving her first right-to-sue letter, dated January 11, 2011. (Third Amended Complaint, ¶ 17.)

treatment), severe and pervasive discrimination that permeates the workplace (hostile work environment), and retaliation for opposing discriminatory practices (retaliation). See Hagan v. City of New York, 39 F. Supp. 3d 481, 494 (S.D.N.Y. 2014).

When, such as here, there is no direct evidence of discrimination, the McDonnell Douglas burden-shifting analysis applies.   See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142-43, 120 S. Ct. 2097, 2106, 147 L. Ed. 2d 105 (2000).   Under this framework, the plaintiff must first establish a prima facie case of race discrimination by showing that (1) she was a member of a protected class; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances of that adverse employment action give rise to an inference of discrimination.   See Terry v. Ashcroft, 336 F.3d 128, 138 (2d Cir. 2003); Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000).

If the plaintiff meets this initial burden, a rebuttable presumption of discrimination arises, and the burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employment action.   See Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254, 101 S. Ct. 1089, 1094, 67 L. Ed.2d 207 (1981).   If the defendant succeeds in making this showing, "the presumption of discrimination arising with the establishment of the *prima facie* case drops from the picture."   Weinstock, 224 F.3d at 42 (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510-11, 113 S. Ct. 2742, 2747, 125 L. Ed. 2d 407 (1993)).

If the defendant meets its burden at the second stage, the burden returns to the plaintiff to prove that the defendant's explanation is pretext for unlawful discrimination.

Kirkland v. Cablevision Sys., 760 F.3d 223, 225 (2d Cir. 2014) (per curiam).   The plaintiff must produce "evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination."   Weinstock, 224 F.3d at 42.   The plaintiff "must adduce enough evidence of discrimination so that a rational fact finder can conclude that the adverse job action was more probably than not caused by discrimination."   Back v. Hastings on Hudson Union Free Sch. Dist., 365 F.3d 107, 123 (2d Cir. 2004); see Terry, 336 F.3d at 138.   "In short, the question becomes whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination."   Id.   But "[i]t is not enough . . . to disbelieve the employer; the factfinder must [also] believe the plaintiff's explanation of intentional discrimination."   Weinstock, 224 F.3d at 42 (quoting St. Mary's, 509 U.S. at 519).

### a.  Disparate Treatment

A disparate treatment claim arises when a member of a protected class is treated less favorably than others under circumstances from which an unlawful motive could be inferred.   See Schwabenbauer v. Bd. of Ed. of City Sch. Dist. of Olean, 667 F.2d 305, 309 (2d Cir. 1981); see also Ott v. Perk Dev. Corp., 846 F. Supp. 266, 275 (W.D.N.Y. 1994).   Such a claim "requires proof that the defendant acted with a discriminatory intent or motive."   See Hagan, 39 F. Supp. 3d at 495 (citing Watson v. Fort Worth Bank & Tr., 487 U.S. 977, 986, 108 S. Ct. 2777, 101 L. Ed. 2d 827 (1988)).

A plaintiff claiming disparate treatment in the absence of direct evidence must produce sufficient evidence from which a reasonable trier of fact could conclude that plaintiff (1) is a member of a protected class, (2) performed her job satisfactorily, (3)

39

suffered an adverse employment action, and (4) suffered the adverse employment action under circumstances that give rise to an inference of unlawful discrimination.   See Collins v. N.Y.C. Transit Auth., 305 F.3d 113, 118 (2d Cir. 2002).

The Second Circuit defines an adverse employment action as a "materially adverse change" in the terms and conditions of an individual's employment.   Sanders v. N.Y.C. Hum. Res. Admin., 361 F.3d 749, 755 (2d Cir. 2004); Galabya v. N.Y.C. Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000).

> To be materially adverse, a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities.   A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation.

Galabya, 202 F.3d at 640 (quotations, citations, and alterations omitted); see also Sanders, 361 F.3d at 755.

Because each action presents unique circumstances and there is no bright-line rule, "courts must pore over each case to determine whether the challenged employment action reaches the level of 'adverse.'"   Wanamaker v. Columbian Rope Co., 108 F.3d 462, 465 (2d Cir. 1997).   Notably, "'not everything that makes an employee unhappy is an actionable adverse action.'"   Valentine v. Standard & Poor's, 50 F. Supp. 2d 262, 284 (S.D.N.Y. 1999) (citing Smart v. Ball State Univ., 89 F.3d 437, 441 (7th Cir. 1996)).

Discrimination can be inferred from "the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge," Leibowitz v. Cornell Univ., 584 F.3d 487, 502 (2d Cir. 2009), or "when an employer

replaces a terminated or demoted employee with an individual outside the employee's protected class," Littlejohn v. City of New York, 795 F.3d 297, 312-13 (2d Cir. 2015) (collecting cases).   For disparate-treatment claims, the plaintiff must show that she "was similarly situated in all material respects to the individuals with whom she seeks to compare herself."   Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000).   That is, she must show "similarities in education, seniority, performance, and specific work duties" and similar requirements for skill, effort and responsibility for jobs performed under similar working conditions."   Potash v. Fla. Union Free Sch. Dist., 972 F. Supp. 2d 557, 580 (S.D.N.Y. 2013) (internal quotation marks and citations omitted); see also Chan v. NYU Downtown Hosp., No. 03-CV-3003, 2006 WL 345853, at *4 (S.D.N.Y. Feb. 14, 2006) (viewing "similarly situated" in terms of "responsibilities, tenure, experience, background, qualifications, education, etc.").

### i. Johnson has established a prima facie case of disparate treatment.

"The burden of establishing a *prima facie* case of disparate treatment is not onerous."   See Carlton v. Mystic Transp., Inc., 202 F.3d 129, 134 (2d Cir. 2000) (characterizing burden as "minimal").   Here, there is no dispute that Johnson is an African American female who was qualified for her job and performed it satisfactorily. And while Defendants argue that the counseling and unfavorable evaluations Johnson received do not constitute actionable adverse employment actions, it remains that those measures of discipline, including multiple Notices of Discipline, played heavily in Arbitrator Gelernter's determination to uphold Johnson's termination under the theory of

progressive discipline.   (See Opinion and Award, pp. 17-24.)   Because those disciplinary measures affected DOCCS's ultimate decision to terminate Johnson's employment (based on Arbitrator Gelernter's decision), a jury could find that they constitute adverse employment actions.   See Beharry v. City of New York, 18-CV-2042 (AJN), 2020 WL 6135147, at *8 (S.D.N.Y. Oct. 19, 2020) (citing Regis v. Metro. Jewish Geriatric Ctr., No. 97-CV-906 (ILG), 2000 WL 264336, at *8 (E.D.N.Y. Jan. 11, 2000)); Smith v. City of New York, 385 F. Supp. 3d 323, 335 (S.D.N.Y. 2019) (finding that a "'notice of discipline' is not an adverse employment action unless it 'creates a materially adverse change in the plaintiff's working conditions'") (citations omitted).   And, of course, there is no dispute that Johnson's suspension and termination constitute adverse employment actions.   See Witek v. City of New York, 807 F. Appx. 52, 54 (2d Cir. Mar. 30, 2020) (summary order).   Johnson has therefore set forth sufficient evidence from which a reasonable jury could conclude that she suffered adverse employment actions.

On the fourth prima facie factor, DOCCS maintains that there is insufficient evidence from which a jury could find that the adverse employment actions Johnson suffered occurred under circumstances giving rise to an inference of unlawful discrimination.   It raises three arguments.

Citing Collins v. New York City Transit Authority, DOCCS first argues that Arbitrator Gelernter's independent finding that Johnson's termination was justified is insurmountable.   305 F.3d 113 (2d Cir. 2002).   In Collins, the Second Circuit held that "[w]here an employee's ultimate termination depends upon, and is allowed by, a decision of an independent and unbiased arbitrator based on substantial evidence after a fair

hearing, the arbitration decision has probative weight regarding the requisite causal link between an employee's termination and the employer's illegal motive."   305 F.3d at 115. The court further stated that to survive summary judgment under such circumstances, the plaintiff "must present strong evidence that the decision was wrong as a matter of fact— e.g., new evidence not before the tribunal—or that the impartiality of the proceeding was somehow compromised."   Id. at 119.

Contrary to DOCCS's argument, however, Collins is neither factually similar nor determinative.   Collins, an African American, had difficulty getting along with his co-workers and supervisors.   Id. at 115-18.   He was involved in multiple confrontations that he claimed were due to racial discrimination and bias against him, culminating in him physically assaulting his supervisor.   Id.   After being terminated for the assault, Collins filed a grievance, which resulted in an arbitration hearing.   Id. at 117.   The arbitration board conducted an independent inquiry and ultimately authorized Collins's termination because it found that he had committed the charged assault.   Id. at 119 ("the tribunal received all the available evidence in an evenhanded proceeding and rendered a decision consistent with the almost overwhelming evidence of [the assault claim]").   In other words, the board found that termination was warranted because Collins assaulted his supervisor (and for no other apparent reason).   Id.   And it reached this determination having considered Collins's claims of bias.   Id.

Johnson's case is distinguishable.   While Johnson had difficulties with her co-workers and supervisors and was found by Arbitrator Gelernter to have assaulted Meli-Rider, she was not terminated solely because of that assault.   Just the opposite,

Arbitrator Gelernter specifically found that "termination might not have been an appropriate penalty" if it were not for Johnson's work history.   (Opinion and Award, pp. 17-18 ("Standing alone, an elbow and a shove and an angry moment of threatening to meet Ms. Meli outside constitutes serious misconduct, but did not involve any injury or detailed verbal threat.").)   It was therefore Johnson's disciplinary record that drove Arbitrator Gelernter's decision to approve termination, not her encounter with Meli-Rider.

But the circumstances of Johnson's disciplinary record were not the subject of the arbitration proceedings.   Arbitrator Gelernter simply accepted Johnson's disciplinary record at face value without consideration of her claims that her record was the product of years-long unlawful disparate treatment and retaliation.[19]   Id. at 20 ("Ms. Johnson may feel wronged and that the agency is discriminating against her, but the extent and proof of those allegations are to be determined by the court or agency considering those complaints.").   In this sense, Arbitrator Gelernter rubber-stamped Johnson's supervisors' previous determinations that discipline was warranted and assumed the legitimacy of those actions.   Cf. Collins, 305 F.3d at 119 (noting that the arbitration board did not rubber-stamp the recommendations of Collins's supervisors).

Unlike in Collins then, Arbitrator Gelernter made her determination without full presentation or consideration of all relevant facts.   Consequently, her determination, while perhaps relevant and probative, does not carry the presumptive weight that DOCCS attributes to it.   See Wilson v. New York, 15 Civ. 23 (CBA) (VMS), 2017 WL 9674497, at

---

19 To be clear, this Court ascribes no error to Arbitrator Gelernter's conclusion in this regard given the limited scope of issues before her.

*32 (E.D.N.Y. Jan. 24, 2017) (affording arbitrator's decision reduced weight where evidence in support of discrimination claims were not considered); Chan v. Donahoe, 63 F. Supp. 3d 271, 299 (E.D.N.Y. 2014) (finding Collins inapposite where arbiter refused to consider background evidence probative of the plaintiff's retaliation claim); White v. Conn. Dep't of Corr., No. 3:08-cv-1168 (CFD), 2010 WL 3447505, at *9 n. 16 (D. Conn. Aug. 24, 2010) (finding that independent arbiter's decision carried reduced weight because not all of the relevant facts were presented, particularly those of disparate treatment).

Collins is also not determinative.   While the Collins court held that an arbitrator's decision "is highly probative of the absence of discriminatory intent," the court did not foreclose subsequent Title VII claims, holding that "a negative arbitration decision rendered under a CBA does not preclude a Title VII action by a discharged employee . . . [h]owever, a decision by an independent tribunal that is not itself subject to a claim of bias will attenuate a plaintiff's proof of the requisite causal link."   Id.; see also Whitsey v. Norfolk S. Ry. Co., Case No. 2:08-cv-1632-SLB, 2010 WL 11614556, at *11 (N.D. Ala. Mar. 31, 2020) (finding that "while Collins stands for the proposition that an arbitration decision may be probative, it does not hold that an arbitration decision is dispositive on the issue of pretext").   Johnson's disparate treatment claim is therefore not foreclosed by Arbitrator Gelernter's decision.

DOCCS next argues that Johnson's prima facie case fails because her disparate treatment claim is nothing more than an objection to the accepted theory of progressive discipline.   This argument is born out of a portion of Johnson's deposition testimony wherein she arguably voices her disagreement with the concept that two officers engaged

45

in similar misconduct could be disciplined differently due to their dissimilar disciplinary history.[20]   (Johnson Dep. pp. 379-381.)

But the record is far more expansive than this short excerpt from Johnson's deposition.   No fair reading of the evidence as a whole, and certainly not one viewing the evidence in Johnson's favor, could result in the conclusion that Johnson challenges nothing more than non-actionable, legitimate progressive discipline.   DOCCS assumes the very point in dispute—whether Johnson's disciplinary record is legitimate or whether

---

20 The cited excerpt is as follows:

> Q:   I'm asking you if it's reasonable for DOCCS to treat you, a black female officer with a history of discipline infractions, differently than a white male officer who has no history of disciplinary infractions?
>
> A:   Well, actually, that is exactly what was taking place.   Just because an officer doesn't have a history, if they do something wrong, they should get an NOD for it or they should be counseled for it.   And there were officers that had formals and NODS that did more egregious things than I did and nothing happed to them.
>
> That is exactly why I felt that, as a black female, I was treated differently, I was discriminated against, because I know of incidences of officers that did way more severe things on the job and that's -  that was their justification, well, this officer did not have any prior NODs, so we're not going to give this officer discipline.
>
> That's not right.   That's not how that is supposed to go.   If they implement policy, policy, policy, policy, employees' manual, collective bargaining against Bertha Johnson, if an officer is found sleeping on a unit, he should get an NOD for it.   It shouldn't matter if he has prior discipline or not.
>
> I don't feel that I should get a NOD because I have prior discipline in my file and this officer shouldn't get an NOD for sleeping on a unit because he didn't have prior discipline.   That's not - - that's not fair treatment.   That's disparate treatment and that's what was taking place.

(Johnson Dep. pp. 379-381.)

it is the product of unlawful discrimination.   See, e.g., Plaintiff's Memorandum of Law, Docket No. 148, p. 12 ("This is essentially a case of disparate impact treatment by way of unfounded and excessive discipline.").   That is, DOCCS assumes that Johnson's disciplinary history is the result of legitimately imposed progressive discipline, and that her claims must thus be viewed as challenging that non-actionable process.   But the legitimacy of the discipline imposed (i.e., whether or not it was the result of racial discrimination) is for the jury to decide after weighing the competing evidence.   And even within the cited deposition testimony, Johnson articulates her claim that she was treated less favorably than her similarly situated colleagues: "And there were officers that had formals and NODs that did more egregious things than I did and nothing happened to them."   (Id. at p. 380.)   DOCCS's second argument is therefore unpersuasive.

DOCCS next argues that Johnson's prima facie case fails because there is insufficient evidence from which a jury could conclude that DOCCS treated a similarly situated employee engaged in similar conduct more favorably that Johnson.   "A showing of disparate treatment—that is, a showing that the employer treated plaintiff less favorably than a similarly situated employee outside her protected group—is a legitimate means of raising an inference of discrimination for purposes of making out a prima facie case." Drehmer v. New York, 20-CV-6143 (CJS), 2020 WL 6205690, at *6 (W.D.N.Y. Oct. 22, 2020) (citing Mandell v. Cnty. of Suffolk, 316 F.3d 368, 379 (2d Cir. 2003)).   To proceed on such a theory, the plaintiff must show that she is similarly situated to a comparator in all material respects, such as in education, seniority, work duties, etc.   See Graham, 230 F.3d at 39; Potash, 972 F. Supp. 2d at 580.   "Whether two employees are similarly

situated ordinarily presents a question of fact for the jury." Graham, 230 F. 3d at 39 (citing cases).

The record contains sufficient evidence from which a reasonable jury could find that DOCCS treated similarly situated individuals more favorably than Johnson. By way of example only, Johnson testified that she was disciplined for excessive absenteeism after DOCCS denied her FMLA coverage that it routinely extended to other white employees. (Johnson Aff., ¶¶ 85-88.) Johnson further testified that DOCCS continued to pursue disciplinary charges against her for missing timecards in November 2008 (Fifth Notice of Discipline), even after she submitted them, but discontinued disciplinary charges against other white officers with missing timecards who similarly re-submitted them, with such differential treatment specifically recognized by Arbitrator Rinaldo. (Johnson Aff., ¶¶ 104, 111, Exhibit 52.) She also maintains that she was further targeted for discipline for writing on timecards in 2010, while two Caucasian officers—Marcia Acosta and William Arnet—were not. (Johnson Aff., ¶ 158, Exhibit 79.)

The record further contains evidence that Johnson was suspended and issued her seventh Notice of Discipline for not removing library passes from the officers' desk window, but that white officers were neither required to remove the passes nor disciplined for failing to do so. (Plaintiff's Statement, ¶¶ 50-53, 63; Johnson Aff., ¶¶ 156, 161-176, 186, 197; Johnson Dep., pp. 378, 391; Reinhold Decl., ¶ 68.) As to this incident, Arbitrator McDonnell found that DOCCS appeared to "engage in discriminatory treatment" of Johnson by not disciplining or even questioning anyone else involved with the library passes, and he expressed concern with DOCCS's failure to treat Johnson equally.

(Reinhold Decl., ¶ 71 (Johnson-37, 41).)   There is also evidence that Johnson was singled out for discipline—two Notices of Discipline—for her interactions with Meli-Rider, while Meli-Rider, a white officer, received no discipline.   (Plaintiff's Statement, ¶¶ 74, 76; Reinhold Decl., ¶¶ 79, 81, 82 (Johnson-6296-97, 6341).)   Again, these are only some examples of the evidence supporting Johnson's claim.

DOCCS focuses its argument on two white, male comparators: Officers Sweeney and Zajac.   It argues that neither individual is similarly situated to Johnson because neither possesses Johnson's extensive disciplinary history.   But here again, DOCCS assumes the legitimacy of Johnson's disciplinary record and attempts to use it as a distinguishing factor.   But if the jury credits Johnson's evidence and finds that DOCCS unlawfully targeted her for unwarranted or excessive discipline because she is African American, then it could reasonably discount her disciplinary history and find that she was similarly situated to those who had lesser or no disciplinary records.   In other words, this Court cannot accept DOCCS's invitation to assume the legitimacy of Johnson's disciplinary history and rely on it to grant summary judgment based on lack of suitable comparators.   The jury, weighing all of the evidence, must determine Johnson's claim. This argument is therefore unpersuasive.

Accordingly, having rejected DOCCS's arguments to the contrary, this Court finds that Johnson has carried her burden of demonstrating a prima facie case of discrimination.   Alternatively, given the minimal burden at this stage and DOCCS's proffer of a legitimate, non-discriminatory reason for disciplining Johnson and terminating her employment (discussed below), this Court finds it most expeditious to assume the

existence of a prima facie case and move to the next stage of the analysis. <u>See</u> <u>Besht</u> <u>v. Gen. Motors</u>, 327 F. Supp. 2d 208, 212-13 (W.D.N.Y. 2004) (citing <u>U.S. Postal Serv.</u> <u>Bd. of Governors v. Aikens</u>, 460 U.S. 711, 715, 103 S. Ct. 1478, 1482, 75 L. Ed. 2d 403 (1983) ("Where the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case, whether the plaintiff really did so is no longer relevant.")); <u>Wado v. Xerox Corp.</u>, 991 F. Supp. 174, 187 (W.D.N.Y. 1998).

### ii. DOCCS has articulated legitimate, non-discriminatory reasons for Johnson's discipline and termination

The burden now rests with DOCCS to produce legitimate, non-discriminatory reasons for Johnson's discipline and termination. <u>See</u> <u>Reeves</u>, 530 U.S. at 142 (noting that the defendant's burden at the second stage is not one of proof or persuasion, but is more appropriately considered a burden of production.) "This explanation must be 'clear and specific.'" <u>Gallo</u>, 22 F.3d at 1226 (quoting <u>Meiri</u>, 759 F.2d at 997). Here, DOCCS maintains that it disciplined Johnson because she violated various rules, orders, and directives, and ultimately terminated her employment after Arbitrator Gelernter determined that she threatened and shoved Meli-Rider. These are legitimate, non-discriminatory reasons for the adverse employment actions taken against Johnson.

### iii. Johnson has produced sufficient evidence from which a reasonable jury could conclude that DOCCS's legitimate, non-discriminatory reasons for her discipline and termination are a pretext for discrimination.

The question now is whether the record contains sufficient evidence from which a factfinder could reasonably conclude that DOCCS's legitimate, non-discriminatory reasons for disciplining Johnson and terminating her employment are false and mere

pretext for unlawful race discrimination.

"Where a plaintiff has alleged that an employer's reasons for an adverse employment action are pretextual, all reasonable inferences must be drawn in favor of the plaintiff's showing of pretext." Joseph v. Manhattan & Bronx Surface Transit Operating Auth., No. 96 Civ. 9015, 2004 WL 1907750, at *14 (S.D.N.Y. Aug. 25, 2004). At this stage, the court must "examin[e] the entire record to determine whether the plaintiff could satisfy his 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.'" Schnabel v. Abramson, 232 F.3d 83, 90 (2d Cir. 2000) (quoting Reeves, 530 U.S. at 143.) This requires the court to determine whether "there is sufficient potential proof for a reasonable jury to find the proffered legitimate reason merely a pretext for impermissible retaliation." Richardson v. N.Y. State Dep't of Corr. Servs., 180 F.3d 426, 443 (2d Cir. 1999). A defendant's proffered non-discriminatory reason, however, "cannot be proved to be a 'pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." Olle v. Columbia Univ., 332 F.Supp.2d 599, 617 (S.D.N.Y. 2004) (quoting St Mary's, 509 U.S. at 502); see also AB v. Rhinebeck Cent. Sch. Dist., 224 F.R.D. 144, 153 n.9 (S.D.N.Y. 2004).

Thus, to avoid summary judgment, Johnson must establish the existence of a genuine issue of fact as to whether DOCCS's proffered explanations are false and merely pretext for unlawful discrimination. Weinstock, 224 F.3d at 42. Unless Johnson can point to evidence that reasonably supports a finding of prohibited discrimination, DOCCS is entitled to summary judgment. See James v. N.Y. Racing Ass'n, 233 F.3d 149, 154

(2d Cir. 2000); see also Reeves, 530 U.S. 133 at 148 (noting that a defendant is entitled to summary judgment if "the plaintiff create[s] only a weak issue of fact as to whether the employer's reason [is] untrue and there [is] abundant and uncontroverted independent evidence that no discrimination ha[s] occurred").

"A showing that similarly situated employees belonging to a different racial group received more favorable treatment can also serve as evidence that that employer's proffered legitimate, non-discriminatory reason for the adverse job action was a pretext for racial discrimination." Graham, 230 F.3d at 43.  Thus, if a jury finds that DOCCS subjected Johnson to disparate treatment in discipline when compared to similarly situated employees, it could also find that DOCCS's proffered legitimate, non-discriminatory reason for the adverse actions taken against her, which were premised on those very acts of discipline, were pretextual.  Id. (citing Greenway v. Buffalo Hilton Hotel, 143 F.3d 47, 51 (2d Cir. 1998) (finding that inconsistent application of disciplinary policy was sufficient for jury to find that employer's defense was pretext for discrimination)).  Given the scope of the evidence and numerous disputed issues of material fact previously set forth above, this Court finds that summary judgment is precluded.

### b.  Hostile Work Environment

The Supreme Court has held that Title VII's protections extend beyond "economic" or "tangible" discrimination.  Harris v. Forklift Sys., 510 U.S. 17, 21, 114 S. Ct. 367, 370, 126 L. Ed. 2d 295 (1993) (citing Meritor Sav. Bank, FSV v. Vinson, 477 U.S. 57, 64, 106 S. Ct. 2399, 91 L. Ed. 2d 49 (1986)).  That is, Congress enacted Title VII to "strike at the

entire spectrum of disparate treatment of men and women in employment," including the requirement that employees work in a hostile or abusive environment.   Harris, 510 U.S. at 21.

To survive a motion for summary judgment, a plaintiff asserting a hostile work environment claim must produce sufficient evidence from which a reasonable trier of fact could conclude "(1) that the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of [her] work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer."   Mack v. Otis Elevator Co., 326 F.3d 116, 122 (2d Cir. 2003) (quoting Richardson, 180 F.3d at 436).

As to the first prong, "a plaintiff must produce enough evidence to show that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create and abusive working environment."   Rivera v. Rochester Genesee Reg'l Trans. Auth., 743 F.3d 11, 20 (2d Cir. 2014) (quotations and citations omitted).   Both objective and subjective elements must be satisfied: "the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive."   Raspardo v. Carlone, 770 F.3d 97, 114 (2d Cir. 2014); see also Leibovitz v. N.Y.C. Transit Auth., 252 F.3d 179, 188 (2d Cir. 2001).   But notably, a plaintiff need show only that the discriminatory work environment was severe or pervasive, not both.   See Pucino v. Verizon Commc'ns, Inc., 618 F.3d 112, 119 (2d Cir. 2010); Zambrano-Lamhaouhi v. N.Y.C. Bd. of Educ., 866 F.

Supp. 2d 147, 161 (E.D.N.Y. 2011) ("Severity and pervasiveness are independent standards, only one of which the plaintiff must meet.")   And of course, the plaintiff must demonstrate that he or she was subjected to the hostile work environment because of their race (or another protected characteristic).   See Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001).

Whether workplace discrimination is sufficiently severe or pervasive depends on the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris, 510 U.S. at 23.   "Generally, unless an incident of harassment is sufficiently severe, 'incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'"   Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 102 (2d Cir. 2010) (quoting Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002)); Faragher v. City of Boca Raton, 524 U.S. 775, 788, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998) (stating that simple teasing, offhand comments, and isolated incidents (unless extremely serious) do not suffice).   In the end, the severity requirement is "demanding to ensure that Title VII does not become a general civility code."   Faragher, 524 U.S. at 788 (finding that the severity requirement, when properly applied, "will filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing") (internal quotation marks and citations omitted).

As to the second prong—imputation of the hostile work environment to the

54

employer—liability depends on whether the harassment is perpetrated by a supervisor or co-worker.   See Wiercinski v. Mangia 57, Inc., 787 F.3d 106, 113 (2d Cir. 2015).   If the harasser is in a supervisory position over the plaintiff, the employer is strictly liable, unless it establishes that (1) it reasonably acted to prevent and correct the harassing behavior, and (2) the plaintiff unreasonably failed to partake in any preventive or corrective opportunities provided by the employer or otherwise failed to avoid the harm.   See Faragher, 524 U.S. at 807; Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998).   If the harasser is a non-supervisory coworker, an employer is liable only if it either "failed to provide a reasonable avenue for complaint" or "knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action."   Duch v. Jakubek, 588 F.3d 757, 762 (2d Cir. 2009).

DOCCS maintains that it is entitled to summary judgment on Johnson's hostile-work-environment claim because the conduct she alleges, even if proven, does not rise to the level of a hostile work environment, and there is no basis to impute any of the alleged conduct to DOCCS.   In response, Johnson argues that the evidence of intimidating discipline, arbitration sessions, and her experience in the conference room sufficiently supports her hostile-work environment claim.   This Court disagrees.

Viewing the record and drawing all inferences in Johnson's favor, this Court finds insufficient evidence from which a reasonable jury could find that Johnson was subjected to severe and pervasive conditions that altered her work environment.   The conduct of which Johnson complains simply does not rise to the hostile-work-environment standard.

Tellingly, Johnson devotes only two paragraphs of her 27-page brief to defending these claims, see Plaintiff's Memorandum of Law, Docket No. 22, pp. 33-34, and she makes little effort to identify the specific circumstances that she contends meet the applicable high standard.  See Ramirez, 2020 WL 5819551, at *3 ("A district court, however, is 'under no obligation to engage in an exhaustive search of the record for evidence in support of plaintiffs' claims if they fail to provide it.'") (quoting Jones v. Goord, 435 F. Supp. 2d 221, 259 (S.D.N.Y. 2006)).

For the most part, Johnson cites non-actionable, episodic incidents, such as individual disciplinary proceedings (some of which she concedes were warranted), arbitration proceedings conducted according to a collective bargaining agreement, and being directed to wait in a conference room.  See Alfano, 294 F.3d at 374 ("incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive").  Other incidents involve isolated, unpleasant exchanges with her co-workers and supervisors.  See Sealey v. Affiliated Comput. Servs., Inc., No. 11-CV-489S, 2012 WL 729217, at *4 (W.D.N.Y. Mar. 6, 2012) ("[C]asual comments, rude or derogatory remarks, and conduct motivated by personal animosity or personal feud cannot support a hostile work environment claim.").  While Johnson alleges physically threatening interactions with Lieutenant Wojcinski and Meli-Rider, these again were isolated incidents and not of the sort that would singly support a hostile-work-environment claim.  Consequently, this Court finds insufficient evidence from which a jury could make the threshold finding that Johnson's workplace was so permeated with severe or pervasive discriminatory intimidation that the conditions of her work environment were

altered.  See Mack, 326 F.3d at 122.   DOCCS is therefore entitled to summary judgment on this claim.

### c. Retaliation

Title VII makes it unlawful "for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3 (a).   To survive a motion for summary judgment, a plaintiff claiming retaliation must present sufficient evidence from which a jury could conclude that "(1) defendants discriminated—or took an adverse employment action—against h[er], (2) 'because' [s]he has opposed any unlawful employment practice."  Vega, 801 F.3d at 90.   Broken down, the plaintiff must set forth sufficient evidence that (1) she engaged in protected activity; (2) her employer was aware that she engaged in protected activity; (3) she suffered an adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action.  See Dickens v. Hudson Sheraton Corp., LLC, 167 F. Supp. 3d 499, 522 (S.D.N.Y. 2016).

The concept of "adverse employment action" is broader for Title VII retaliation claims than for Title VII discrimination claims and encompasses any action that "could well dissuade a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 57, 126 S Ct. 2405, 165 L. Ed. 2d 345 (2006); Rivera, 743 F.3d at 25.   And unlike a Title VII discrimination claim, a Title VII retaliation claim requires "but-for" causation: "the plaintiff must plausibly allege that

the retaliation was a 'but-for' cause of the employer's adverse action."   See Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 360, 133 S. Ct. 2517, 186 L. Ed. 2d 503 (2013); Kwan v. Andalex Grp. LLC, 737 F.3d 834, 846 (2d Cir. 2013) ("'[B]ut-for' causation does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive."). In this regard, "a retaliatory purpose can be shown indirectly by timing: protected activity followed closely in time by adverse employment action."   Vega, 801 F.3d at 89; Kwan, 737 F.3d at 845 ("the but-for causation standard does not alter the plaintiff's ability to demonstrate causation . . . through temporal proximity").

Here, the record contains ample evidence from which a jury could conclude that Johnson engaged in protected activity (e.g., numerous discrimination complaints), that DOCCS was aware of her protected activity, that DOCCS subjected Johnson to adverse employment actions, and that there was a causal and temporal connection between Johnson's protected activity and the adverse actions.   DOCCS's only arguments in favor of summary judgment on this claim are the same ones rejected above in the context of Johnson's disparate-treatment claim.   Accordingly, DOCCS's request for summary judgment on Johnson's retaliation claim is denied.

### 2.  14th Amendment Equal Protection Claim

Forty-two U.S.C. § 1983 provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges,

> or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

Civil liability is imposed under 42 U.S.C. § 1983 only upon persons who, acting under color of state law, deprive an individual of rights, privileges, or immunities secured by the Constitution and laws. See 42 U.S.C. § 1983. On its own, § 1983 does not provide a source of substantive rights, but rather, a method for vindicating federal rights conferred elsewhere in the federal statutes and Constitution. See Graham v. Connor, 490 U.S. 386, 393-94,109 S. Ct. 1865, 1870, 104 L. Ed. 2d 443 (1989) (quoting Baker v. McCollan, 443 U.S. 137, 145 n.3, 99 S. Ct. 2689, 2695 n.3, 61 L. Ed. 2d 433 (1979)). Accordingly, as a threshold matter in reviewing claims brought under § 1983, it is necessary to precisely identify the constitutional violations alleged. See Baker, 443 U.S. at 140. Here, Johnson's equal protection claim against Defendant Powers falls under the Fourteenth Amendment.

The Fourteenth Amendment Equal Protection Clause provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws" U.S. Const. amend. XIV, § 1. It directs that "all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439, 105 S. Ct. 3249, 87 L. Ed. 2d 313 (1985).

In the employment context, "[t]he Fourteenth Amendment provides public employees with the right to be 'free from discrimination.'"   Vega, 801 F.3d at 87 (quoting Demoret v. Zegarelli, 451 F.3d 140, 149 (2d Cir. 2006)).   It is implicated, *inter alia*, "when the government makes class-based decisions in the employment context, treating distinct groups of individuals categorically differently."   Engquist v. Or. Dep't of Agric., 553 U.S. 591, 607, 128 S. Ct. 2146, 170 L. Ed. 2d 975 (2008).   An individual claiming protected-class-based discrimination or retaliation in public employment in violation of the Fourteenth Amendment may therefore sue under 42 U.S.C. § 1983.   See Naumovski v. Norris, 934 F.3d 200, 211 (2d Cir. 2019); Vega, 801 F.3d at 82.

A plaintiff's Fourteenth Amendment equal protection claim mirrors a Title VII claim once action under color of state law is established: "[t]he elements of one are generally the same as the elements of the other and the two must stand or fall together."[21] Feingold v. New York, 366 F.3d 138, 159 (2d Cir. 2004) (citing Annis v. Cnty. of Westchester, 136 F.3d 239, 245 (2d Cir. 1998) ("In analyzing whether conduct was unlawfully discriminatory for purposes of § 1983, we borrow the burden-shifting framework of Title VII claims.")).

Here, Defendant Powers first argues that he is entitled to summary judgment because he was not personally involved in the alleged constitutional deprivations. Personal involvement in the deprivation of federal constitutional rights is the *sine qua non* of liability under § 1983.   See Haygood v. City of New York, 64 F. Supp. 2d 275, 280

---

21  Unlike a Title VII claim, however, a § 1983 claim can be brought against an individual.   See Vega, 801 F.3d at 88.

(S.D.N.Y. 1999). "[A] defendant in a § 1983 action may not be held liable for damages for constitutional violations merely because he held a high position of authority." Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996). Rather, personal involvement must be demonstrated as a prerequisite to an award of damages under § 1983. See McKinnon v. Patterson, 568 F.2d 930, 934 (2d Cir. 1977); Richardson v. Coughlin, 101 F. Supp. 2d 127, 129 (W.D.N.Y. 2000); Pritchett v. Artuz, No. 99 Civ. 3957 (SAS), 2000 WL 4157, at *5 (S.D.N.Y. Jan. 3, 2000).

The Second Circuit construes personal involvement to mean "direct participation, or failure to remedy the alleged wrong after learning of it, or creation of a policy or custom under which unconstitutional practices occurred, or gross negligence in managing subordinates." Black, 76 F.3d at 74; see also Saxon v. Attica Med. Dep't., 468 F. Supp. 2d 480, 483 (W.D.N.Y. 2007) ("personal involvement can be established upon a showing that a supervisory official became aware of a violation and failed to remedy it"); Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994).

Viewing the evidence in the light most favorable to Johnson, this Court finds sufficient evidence from which a jury could reasonably determine that Defendant Powers was personally involved in the alleged discrimination. Powers admits that he was aware of Johnson's discrimination complaints and that he was personally involved in whether such complaints were handled on a local level or referred to Labor Relations for discipline. (Deposition of William Powers ("Powers Dep."), Docket No. 123-1, Exhibit 24, pp. 856, 858, 862.) He further acknowledged during his deposition that he was aware of Johnson's specific complaints against Sergeant Pyra, Lieutenant Wojcinski, and Officer

Meli-Rider, and others, and that he was involved each time a misconduct report concerning Johnson was sent to the Labor Relations department.  Id. pp. 857, 862.  He also admitted that he was aware of Johnson's complaints that Caucasian officers were being treated more leniently in terms of discipline, but responded by simply reminding supervisors to apply all the rules as evenly as possible.  Id. p. 878.

There is also more specific evidence from which a jury could find Defendant Powers's personal involvement.  For example, Powers sent an email in February 2010 to the Labor Relations department apologizing for Johnson having been rated "excellent" during her performance evaluation—attributing it to "weak supervision displayed by my staff"—and lamenting that it "completely wipes out our case" against Johnson.  (Johnson Aff., ¶ 67, Exhibit 16.)  In a 2011 email, Powers referred to Arbitrator McDonnell, who found that DOCCS appeared to engage in discriminatory and unequal treatment of Johnson, as "the good for nothing arbitrator[ ]."  (Johnson Aff., ¶ 207, Exhibit 121.)  And after the incident when Johnson was observed on video spending time in the storeroom, Powers forwarded a packet to Labor Relations and wrote that the incident was "definitely worthy of disciplinary action."  (Powers Dep., p. 864.)  Powers also distributed copies of Johnson's federal complaints to supervisors with the notation that "we should all be aware of her activities."  (Johnson Aff., ¶ 208, Exhibit 122 (Johnson-7421); ¶ 219, Exhibit 131 (Johnson-7502).)

Given this and other evidence in the record from which a reasonable jury could find Defendant Powers personally involved, his request for summary judgment on this basis must be denied.

Defendant Powers alternatively argues that he is entitled to summary judgment based on qualified immunity.   The doctrine of qualified immunity protects government officials from liability for damages only if their actions violated no "clearly established constitutional rights of which a reasonable person would have known."   Allah v. Goord, 405 F. Supp. 2d 265, 272 (S.D.N.Y. 2005) (quoting Velez v. Levy, 401 F.3d 75, 100 (2d Cir. 2005)); see also Coggins v. Buonora, 776 F.3d 108, 114 (2d Cir. 2015) ("Qualified immunity protects public officials from civil liability 'if (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law.'") (quoting Salim v. Proulx, 93 F.3d 86, 89 (2d Cir. 1996)); White v. Pauly, 137 S. Ct. 548, 551, 196 L Ed. 2d 463 (2017) (per curiam).

Here, Johnson's right to be free from workplace discrimination was clearly established during the timeframe at issue.   Thus, if Johnson establishes that her rights were violated, Defendant Powers is not entitled to qualified immunity.   Moreover, given the unresolved issues of material fact, this Court cannot determine whether it was objectively reasonable for Powers to believe that his conduct did not violate any of Johnson's rights.   Qualified immunity therefore cannot be determined at this stage. Powers's request for summary judgment on this basis is therefore denied.

### D.  Johnson's Cross-Motion for Summary Judgment

Dispositive motions were due by January 15, 2017.   (Docket No. 116.) Defendants timely moved for summary judgment on January 13, 2017; Johnson did not file any motions.   This Court subsequently imposed a briefing schedule, which, with adjournments, required Johnson to respond to Defendants' motion by July 31, 2017.

(Docket No. 122.)   By operation of the local rules, this was also the deadline for any cross-motion for summary judgment.   See Rule 7 (b)(2)(A) of the Local Rules of Civil Procedure for the Western District of New York.

On July 31, 2017, Johnson filed two submissions in opposition to Defendants' motion, neither of which referenced a cross-motion for summary judgment.   (Docket Nos. 123, 124.)   Johnson filed both solely in opposition to Defendants' motion.   (See Docket No. 123, ¶ 2.)   Johnson's subsequent motions for extension of time similarly sought leave solely to complete her response in opposition to Defendants' motion for summary judgment, with no mention of a cross-motion.   (Docket Nos. 125, 129.)

It was not until late September 2017, nearly two months after the deadline for cross motions, that Johnson embedded her request for summary judgment in her Rule 56 Statement and memorandum of law.[22]   (Docket Nos. 146, 148.)   Johnson never moved to extend her time in which to file a cross-motion, and her out-of-time filing deprived Defendants of any opportunity to respond.   Johnson's cross-motion for summary judgment is therefore denied as untimely.

## IV. CONCLUSION

For the reasons stated above, this Court finds that Johnson's disparate-treatment and retaliation claims against DOCCS, and her Fourteenth Amendment claim against Defendant Powers, must proceed to trial.   This Court further finds that DOCCS is entitled to summary judgment on Johnson's hostile-work-environment claim.   Consequently,

---

22 Johnson failed to file a notice of motion as required under the local rules. See Rule 7 (a)(1) of the Local Rules of Civil Procedure for the Western District of New York.

Defendants' motion for summary judgment will be granted in part and denied in part. Johnson's cross-motion for summary judgment will be denied.   The motions to strike are resolved as set forth above.   Before proceeding to trial, the parties must engage in mediation to determine whether a pretrial resolution of this matter can be reached.

## V.   ORDERS

IT HEREBY IS ORDERED, that Defendants' Motion for Summary Judgment (Docket No. 117) is GRANTED in part and DENIED in part, consistent with this Decision and Order.

FURTHER, that Plaintiff's Cross-Motion for Summary Judgment (Docket No. 146, p. 1) is DENIED.

FURTHER, that Defendants' Motion to Strike (Docket No. 140) is GRANTED in part and DENIED in part.   The Clerk of Court is directed to STRIKE the supplemental declaration filed at Docket No. 132.

FURTHER, that Plaintiff's Motion to Strike (Docket No. 146, pp. 3-10) is DENIED.

FURTHER, that this case is REFERRED for alternative dispute resolution under Section 2.1.B of the Plan for Alternative Dispute Resolution in the United States District Court for the Western District of New York ("the ADR Plan").

FURTHER, that the parties shall comply with all relevant requirements of the ADR Plan, which is available at http://www.nywd.uscourts.gov.

FURTHER, that within 10 days of the entry date of this decision, the parties shall contact ADR Administrator Amanda G. Williams for direction on how to proceed with mediation under the March 16, 2020 General Order Re: Alternate Dispute Resolution

Under Circumstances Created by COVID-19 and its progeny.

FURTHER, that the parties are permitted to re-engage in mediation with Mediator Krista Gottlieb or another federal-court mediator upon whom they might agree.

FURTHER, that the parties shall conclude their mediation efforts and file a joint written notice concerning the status of mediation by May 21, 2021.

SO ORDERED.

Dated:        February 26, 2021
             Buffalo, New York

s/William M. Skretny
WILLIAM M. SKRETNY
United States District Judge
